**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BIRHAN TEWABE,

*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney General,

*Respondent.*

No. 04-1327

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A79-497-029)

Argued: November 29, 2005

Decided: April 26, 2006

Before WILKINSON, MICHAEL, and MOTZ, Circuit Judges.

Petition for review granted; vacated and remanded by published opinion. Judge Michael wrote the opinion, in which Judge Wilkinson and Judge Motz joined.

## COUNSEL

**ARGUED:** Firooz T. Namei, MCKINNEY & NAMEI CO., L.P.A., Cincinnati, Ohio, for Petitioner. Shelley Rene Goad, UNITED STATES DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Civil Division, Washington, D.C., for Respondent. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, Civil Division, Linda S. Wendtland, Assistant Director, UNITED STATES

DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Civil Division, Washington, D.C., for Respondent.

---

**OPINION**

MICHAEL, Circuit Judge:

An immigration judge (IJ) denied the application of Birhan Tewabe, an Ethiopian citizen, for asylum and other relief, and the Board of Immigration Appeals (BIA) affirmed in a split decision. The IJ denied the application after finding that Tewabe's testimony was implausible. Because the IJ did not provide specific and cogent reasons for discrediting Tewabe's testimony, we grant her petition for review, vacate the BIA's decision, and remand for further proceedings.

I.

In July 2001 Tewabe submitted an application for asylum and withholding of removal under 8 U.S.C. §§ 1158(a)(1), 1231(b)(3), and for relief under the Convention Against Torture, *see* 8 C.F.R. § 208.16(c). At her March 2002 hearing she offered the following evidence, mainly through her testimony and an affidavit. Tewabe is an Ethiopian citizen. Both of her parents are ethnic Tigrayans (Tigray is an Ethiopian province bordering Eritrea). Tewabe's father was born in Asmara, which is now part of Eritrea. In 1998 Tewabe began working as a flight attendant for Ethiopian Airlines, which is run by the Ethiopian government.

In mid-1998 one of Tewabe's cousins was deported from Ethiopia to Eritrea when authorities discovered that his father was born in what is now Eritrea. At the time, there was armed conflict on the Ethiopia-Eritrea border, and the Ethiopian government regularly detained and deported Eritreans and Ethiopians of Eritrean origin without due process. Tewabe's father and her cousin's father went to the office of the Immigration Security and Refugee Affairs (ISRA) to complain about the cousin's deportation. When they arrived, the two men were asked to show their identification, and ISRA officials learned that both were born in Eritrea. They were detained and immediately deported.

When Tewabe's father failed to return home, her mother went to ISRA to inquire but was turned away. Tewabe's mother contacted relatives in the Tigray People's Liberation Front (TPLF), which is a faction of the ruling coalition, the Ethiopian Peoples' Revolutionary Democratic Front (EPRDF). She learned that her husband (Tewabe's father) had been deported. Shortly thereafter, Tewabe was suspended from her job at Ethiopian Airlines because her personnel file reflected that her father was born in Eritrea. After two months she was permitted to return to work because her mother and relatives in the TPLF convinced airline management that she was in fact Tigrayan. Tewabe's sister Hirut fled to Israel after experiencing similar problems at her place of employment, the Ethiopian Ministry of Health, where officials assumed she was ethnic Eritrean. Tewabe's brother Daniel moved to London because he had been detained on several occasions by local officials who believed he was Eritrean.

In 1999 Tewabe learned that her cousin, who had been deported to Eritrea, had died in an Eritrean military training camp. Shortly thereafter, while attending a work meeting at Ethiopian Airlines, Tewabe criticized the deportations, stressing that innocent people were being thrown out of the country. The next day, Ethiopian Airlines again suspended Tewabe based on the assumption that she was Eritrean. After three weeks she was able to return to her job, again with the help of her mother's relatives.

In March 2001 twelve members of the TPLF, including one of Tewabe's relatives, were ousted from the TPLF central committee and from their government positions. According to Tewabe, relatives of the dissidents became targets of government persecution. Tewabe and her family supported the dissidents' rights to express themselves and to have access to the media. According to Tewabe, a TPLF audit commission found the actions of the prime minister's faction undemocratic and illegal. The prime minister ignored the commission's report and began eliminating his opponents in order to secure his power. Tewabe and her family spoke out against the government when a dissident leader, Seye Abraha, was imprisoned. Several TPLF members were purged and hundreds of Tigrayans were abducted, while others, fearing for their lives, left the country.

Later, on the morning of June 22, 2001, Tewabe and several of her family members attended a "kebele" meeting. A kebele is a neighbor-

hood association that appears to be a rough equivalent of local government in Ethiopia. At the June 22 kebele meeting, Tewabe spoke out against the undemocratic and oppressive actions of the prime minister and his supporters. Tewabe believed that she had an obligation to speak out, and a Tigrayan co-worker, Haptu, had encouraged her to speak out at this particular meeting. After Tewabe had spoken at length, an EPRDF official yelled at her and told her to sit down. Tewabe's brother stood up and defended her, and people at the meeting began shouting at each other. Although Tewabe had spoken at earlier kebele meetings, she had never spoken with such fervor, nor had she witnessed such a hostile reaction. Tewabe became very frightened and talked to her family about leaving the meeting. Tewabe decided to leave with three of her sisters, although her mother, who believed nothing would happen, decided to remain at the meeting. Another sister, Almaz, stayed with her mother, and Tewabe's brother, Beemnet, also stayed so that the two women would not be alone.

Tewabe and her three sisters went directly to the house of Tewabe's friend and fellow flight attendant, Nardos Fisseha. Fisseha was scheduled to work that night on a flight leaving for the United States. Tewabe asked Fisseha to switch flights with Tewabe so that Tewabe could leave the country and "observe the situation from afar," J.A. 438, and Fisseha agreed. (It was "very, very common" for flight attendants on Ethiopian Airlines to switch flights. J.A. 76.) Tewabe left on Fisseha's flight and arrived in the United States the next day, June 23, 2001. At the time, Tewabe had a "good job" in Ethiopia that she liked, and she was engaged to be married. J.A. 74. As a flight attendant, Tewabe had been to the United States many times before, including about four times in 2000 and about four times in the first half of 2001. She had always returned as scheduled and had never before applied for asylum.

When Tewabe arrived in the United States, she went to the hotel where the crew was staying and called home. She spoke to a maid who reported that Tewabe's mother, sister (Almaz), and brother (Beemnet), all of whom had remained at the kebele meeting, had been imprisoned. Tewabe then spoke to Almaz's husband, who confirmed the maid's account. Next, Tewabe called her friend Fisseha. Fisseha handed the phone to one of Tewabe's other sisters, who reported that

the police had been to Fisseha's house looking for Tewabe and her sisters. Fisseha was hiding Tewabe's three unincarcerated sisters from the police, and the police became angry when they could not find them. The following day Tewabe called Fisseha again and learned her sisters were no longer with Fisseha. At this point Tewabe became so frightened that she decided to remain in the United States and apply for asylum. Two weeks later, Tewabe learned that her three sisters had fled to Nairobi, Kenya. Tewabe submitted her application for asylum and other relief on July 27, 2001, slightly over a month after she had arrived in the United States.

Aside from her own testimony, Tewabe had limited evidence available to present at her hearing. All of Tewabe's immediate family members who had remained in Ethiopia, including her mother, were in prison. The nine of her eleven siblings who were not in prison were scattered in various countries around the world. (At least one of her siblings has obtained refugee status.) Tewabe asked her brother-in-law, Almaz's husband, and Fisseha to write letters in support of her asylum application, but neither of them did so. Fisseha refused to provide any evidence in support of the application because she had become frightened and did not want to be involved with Tewabe any longer. Tewabe was able to present two other witnesses at the hearing. Her sister from Canada, Ghidey, testified that she had heard from Almaz's husband about the arrests of her family members in Ethiopia. Ghidey also testified that Tewabe told her that she decided to remain in the United States when she learned of the arrests. In addition, Mulu Werede, Tewabe's acquaintance and former co-worker at Ethiopian Airlines, testified on her behalf. He corroborated Tewabe's testimony about her speaking out against deportations at a work meeting in 1999, and he said that when Tewabe arrived in the United States she told him that she had left Ethiopia because "she made a speech against the government in the [kebele] meeting." J.A. 102.

Tewabe submitted a number of exhibits, including news articles stating that Prime Minister Meles Zenawi's TPLF was still the principal faction in the EPDRF ruling coalition; her Ethiopian Airlines crew member certificate; an Ethiopian Airlines termination of contract dated June 29, 1999; a letter dated July 27, 2001, from the Eritrean Relief and Refugee Commission indicating that her father had been deported to Eritrea from Ethiopia on or about June 20, 1998; a letter

dated September 25, 2001, from Tewabe's sisters in Kenya acknowledging their flight to Nairobi and their mother's imprisonment; a letter dated February 26, 2002, from Tewabe's father stating that he had been deported in June 1998; an Israeli document showing that a sibling had been granted refugee status; a letter dated February 13, 2002, from Tewabe's sister Beirut (in Kenya) stating that the family was a target of Prime Minister Zenawi's TPLF faction because they opposed him and that their mother, brother, and sister were imprisoned because they were accused of supporting the dissidents; and a document issued by the Ethiopian police, dated August 12, 2001, summoning Tewabe for questioning on August 15, 2001.

Immediately after Tewabe's hearing, the IJ issued an oral decision denying her application for asylum and other relief. The IJ based his decision on his determination that her story was not plausible. According to the IJ,

> [T]he particular accounting of the applicant to stand up at a [kebele] meeting while there is great dissention in her country having just gone through a war, knowing of the problems that her family had, particularly her father, to bring attention to herself knowing others who had brought attention to themselves had been placed in jeopardy, to place her family at potential risk and then to abruptly leave the meeting, change a flight, and arrive in the United States to monitor a situation, and the very next day, or that same day, deciding to stay and apply for asylum, is not, in the opinion of this Court, plausible. If the accounting of the applicant is not plausible, the Court must conclude that she does not meet her burden of proof, and that is the conclusion of the Court.

J.A. 24. The IJ mentioned in the first part of his oral decision that Tewabe's case could have benefitted from more corroborating evidence. In the end, however, the IJ denied relief on the ground that her testimony was "not plausible." J.A. 24. Tewabe appealed to the BIA, which issued a split decision affirming the IJ. Tewabe then petitioned this court for review, arguing that the BIA's decision must be vacated because the IJ did not provide specific, cogent reasons for his adverse credibility determination.

## II.

To be eligible for asylum as a refugee, Tewabe must prove that she is "unable or unwilling" to return to her home country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). "The testimony of the [asylum] applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a). Here, the IJ found that Tewabe "d[id] not meet her burden of proof" because her "account[ ] . . . is not plausible," J.A. 24, that is, not credible. The BIA affirmed.

We uphold the agency's decision "unless [it is] manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). And agency findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* § 1252(b)(4)(B); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992). "We also defer to credibility findings that are supported by substantial evidence." *Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004). This deference is broad but not absolute: an IJ "who rejects a witness's positive testimony because in his or her judgment it lacks credibility should offer a specific, cogent reason for his [or her] disbelief." *Id.* (quoting *Figeroa v. INS*, 886 F.2d 76, 78 (4th Cir. 1989)). Examples of specific and cogent reasons include "inconsistent statements, contradictory evidence, and inherently improbable testimony; [in particular,] where these circumstances exist in view of the background evidence on country conditions, it is appropriate for an Immigration Judge to make an adverse credibility determination on such a basis." *In re S-M-J-*, 21 I. & N. Dec. 722, 729, 1997 WL 80984 (BIA 1997) (en banc). "If the IJ's [adverse credibility] conclusion is not based on a specific, cogent reason, but, instead is based on speculation, conjecture, or an otherwise unsupported personal opinion," it cannot be upheld "because . . . it will not have been supported by substantial evidence." *Dia v. Ashcroft*, 353 F.3d 228, 250 (3d Cir. 2003) (en banc).

In *Camara* we rejected an IJ's adverse credibility finding to the extent it was based on the IJ's speculative determination that the petitioner's testimony was implausible. 378 F.3d at 369. The petitioner (Camara) sought asylum and other relief on the ground that she had been raped, tortured, and imprisoned because she openly opposed the

government of her home country, Guinea. *Id.* at 363-64. At her hearing Camara testified that she had escaped from prison in Guinea and that government officials were seeking to rearrest her. She decided that she needed to flee Guinea after members of the military broke into a friend's house looking for her. Before Camara left Guinea, she went to a courthouse where a relative worked to enlist the relative's assistance in obtaining documentation of government actions against her; Camara sought this information to support an eventual asylum application. *Id.* at 365. The IJ found Camara's story implausible and discredited her testimony. The IJ stated, "It simply makes no sense . . . that someone who had just escaped from prison would then present themselves to a dictatorial Government legal institution." *Id.* at 368. We determined that "the IJ's disbelief of Camara's explanation for obtaining her criminal papers was based only on speculation; there is nothing implausible about the idea that Camara would approach a relative for help in her troubles, even if it meant entering a courthouse as an anonymous visitor." *Id.* at 369. We therefore held that the IJ's speculative assessment could not support her adverse credibility finding. Several other courts of appeals have similarly rejected an IJ's adverse credibility determination that is not grounded on specific, cogent reasons. *See, e.g.*, *Gao v. Gonzales*, 424 F.3d 122, 131-32 (2d Cir. 2005); *Shire v. Ashcroft*, 388 F.3d 1288, 1295-99 (9th Cir. 2004); *Dia*, 353 F.3d at 250-60.

The IJ here attached the bare label "implausible" to Tewabe's testimony without providing specific and cogent reasons for doing so. This unexplained characterization is unsustainable because Tewabe's testimony is not inherently implausible. There are, as we will explain, valid reasons that would support a finding that she is credible. In this circumstance, because the IJ failed to provide specific, cogent reasons for his adverse credibility determination, we cannot uphold it.

First, the IJ found Tewabe's account of the June 22, 2001, kebele meeting to be implausible. This implausibility characterization applies to Tewabe's account of why she spoke out against the government at the meeting. The IJ questioned why she would speak in light of the political climate in Ethiopia, the persecution of some of her family members (including her father), and the potential risk to her. These factors might indicate that it was unwise for Tewabe to speak out, but they do not support a finding that her explanation for deciding to

speak out was implausible. Indeed, Tewabe offered several plausible reasons for her decision to speak out. Haptu, a co-worker at the airline and a Tigrayan, had urged Tewabe to attend the meeting and to participate in the discussion. He told Tewabe that she "should not be afraid to speak out at the meeting[ ]" because it was necessary to "educate the people and tell them about what's going on." J.A. 53. In addition, it made sense for Tewabe to speak in that particular forum (a kebele meeting) because the purpose of the meeting was to "find out the thinking of the people." J.A. 55. Tewabe also explained that she did not think of the risks at the moment she decided to speak. Rather, she believed she had an obligation to say something because "from day to day the freedom to speak was being deteriorated." J.A. 58. Furthermore, to the extent the IJ labeled as implausible Tewabe's claim that she spoke out in spite of the risks, there is contrary evidence to suggest that at least some criticism of the government was tolerated. The U.S. State Department's February 2001 country report on Ethiopia stated that "several groups critical of the [Ethiopian] Government [have] held press conferences and public meetings without retribution," although "on occasion the Government [has] restricted [the constitutional] right [to discuss publicly any topic by opposing] the activities and operations of groups critical of the Government." J.A. 121. Moreover, Tewabe had spoken out in the past and had been encouraged to attend the June 22 kebele meeting and voice her opinion.

Second, the IJ found implausible Tewabe's sudden decision to depart to the United States following the morning kebele meeting. The IJ also found it implausible that Tewabe could make the departure arrangements so quickly. Again, the IJ did not offer specific and cogent reasons for these findings. Tewabe, on the other hand, offered specific and plausible reasons for her sudden decision and her ability to leave quickly. She became very frightened at the kebele meeting after the meeting turned hostile and an official yelled at her and told her to sit down. She went to the house of her friend and fellow flight attendant, Fisseha, and asked her to switch flights that night. It is not hard to believe that flight attendants sometimes switch flights and are prepared to travel on short notice. In any case, it was very common for Ethiopian Airline attendants to switch flights, and Fisseha agreed to do so.

Third, the IJ concluded that Tewabe's decision to apply for asylum so soon (within a couple of days) after arriving in the United States was not plausible. The IJ offered no basis for this conclusion and thus did not debunk Tewabe's straightforward account of the timing of her decision. Tewabe's testimony was that, upon her arrival in the United States, she made several phone calls home. During these conversations, she learned that her mother, brother, and sister had been arrested, that her sisters fled to Kenya, and that the Ethiopian police were looking for her. It was not until she had these conversations, which occurred soon after Tewabe's arrival in the United States, that she decided to apply for asylum.

In suggesting reasons why Tewabe's testimony explaining her actions *could be* deemed plausible, we do not purport to find that she was a credible witness. Rather, we simply demonstrate why it was necessary for the IJ to support any adverse credibility determination with specific, cogent reasons. Because the IJ did not provide these reasons, we cannot conclude that his credibility findings are supported by substantial evidence. *See Dia*, 353 F.3d at 260. The case must therefore be remanded for further proceedings.

While we have outlined key portions of Tewabe's testimony and searched through the IJ's decision in vain for a specific and cogent reason for his adverse credibility determination, we do not mean to imply that an IJ must provide extensive reasons for each and every item of testimony that is rejected. We make this point because our deferential standard of review does not allow us to micromanage IJ decisionmaking. *See Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 278 (4th Cir. 2004) ("[Agency] determinations concerning asylum eligibility . . . are conclusive if supported by reasonable, substantial, and probative evidence on the record considered *as a whole*.") (internal quotation marks omitted) (emphasis added). Moreover, the requirement that an IJ provide a specific and cogent reason for an adverse credibility finding leaves ample room for the IJ "to exercise common sense in rejecting [an applicant's] testimony even if the IJ cannot point to . . . contrary evidence in the record to refute it." *Jibril v. Gonzales*, 423 F.3d 1129, 1135 (9th Cir. 2005). The IJ erred in this case simply because he gave no cogent explanation based on common

sense, the record, or any other relevant factor for disbelieving Tewabe.*

In sum, further proceedings are necessary for the agency (beginning with the IJ) to determine whether Tewabe can meet her burden of proving all of the elements of her claim for asylum or other requested relief. These proceedings must be conducted without any consideration of the IJ's prior adverse credibility determination. Accordingly, we grant the petition for review, vacate the BIA's order affirming the IJ's decision, and remand the case to the BIA for further proceedings.

*PETITION FOR REVIEW GRANTED*;
*VACATED AND REMANDED*

---

*When the IJ decided Tewabe's case in 2002, he did not have the benefit of section 101(a)(3)(B)(iii) in the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302, 303, which provides guidance to IJs for making credibility determinations in asylum cases. The section, codified at 8 U.S.C. § 1158(b)(1)(B)(iii), states:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

We are not called upon here to consider the effect of this new provision because it does not apply to asylum applications like Tewabe's filed prior to May 11, 2005. *See* REAL ID Act § 101(h)(2).