PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHEN LIN-JIAN, a/k/a Jian Cheng
Lin,

*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,

*Respondent.*

No. 05-1693

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A96-192-840)

Argued: October 27, 2006

Decided: May 30, 2007

Before NIEMEYER, TRAXLER, and SHEDD, Circuit Judges.

Petition granted in part and denied in part by published opinion. Judge Traxler wrote the majority opinion. Judge Niemeyer wrote an opinion concurring in part and dissenting in part. Judge Shedd wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** Yee Ling Poon, New York, New York, for Petitioner. Lauren A. Wetzler, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Respondent. **ON BRIEF:** Robert Duk-Hwan Kim, New York, New

York, for Petitioner. Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Respondent.

---

**OPINION**

TRAXLER, Circuit Judge:

Chen Lin-Jian, a native of the People's Republic of China, claims that he fled to the United States in order to escape China's "one couple, one child" policy. Lin concedes that he is removable for being present without having been admitted or paroled into the United States, *see* 8 U.S.C. § 1182(a)(6)(A)(i), but seeks relief from removal via political asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The Immigration Judge denied Lin's application for all three forms of relief and the Board of Immigration Appeals ("BIA") summarily affirmed this denial.

Lin petitions this court for review of the BIA's decision. We grant the petition for review as to Lin's claims for asylum and withholding of removal and remand these claims for further evaluation. However, we deny Lin's petition for review of the BIA's denial of relief under the CAT.

I.

A.

Lin and his wife, who remains in China, are from a rural area near Changle City in China's Fujian Province. According to Lin, the couple married in 1993 and they have two children who also remain in China. Their first child, a daughter, was born in April 1994, and the second child, a son, was born in August 1995. For proof of his two children, Lin submitted Notarial Birth Certificates that include pictures of the children, provide their birthdates and birthplaces, and identify Lin and his wife as the parents. The certificates were issued in May 2003 by the Changle City Notary Public Office. Lin also submitted the children's Permanent Resident Registration Cards which include their birthdates and note their relationship to Lin; a Changle

City family-planning check-up card indicating that Lin and his wife have a male child born in August 1995 and a female child born in April 1994; and a family photo.

Lin claims that, after the birth of his daughter, family-planning officials indicated the couple would be required to wait five years before they could have a second child and directed them to use contraceptive measures. At his asylum hearing, Lin testified that in his area of the Fujian province, couples are allowed two children, five years apart. Lin's assertions were consistent with the State Department's 1998 profile of conditions in China submitted by Lin. According to the report, officials in both urban and rural areas of the Fujian province did not follow a strict one-child policy, often permitting a second child if the first is female and the parents wait for a given number of years between children. *See* Report of U.S. Dept. of State, *China: Profile of Asylum Claims and Country Conditions*, at 20 (April 14, 1998) ("1998 Report").

Despite the order that they wait five years, Lin claims that his wife gave birth to their son sixteen months later. Lin testified that family-planning officials did not immediately discover the unauthorized birth; rather, they became aware of Lin's second child the following year in December 1996 when Lin's parents went to file a household registration for Lin's son. Lin testified that the government imposed a fine of 10,000 RMB, which Lin testified was the equivalent of $1,000 at the time. Lin paid the fine and submitted a receipt evidencing payment of the fine on December 15, 1996, for "violation of [the] birth interval." J.A. 227.

According to Lin's affidavit, family-planning officials also ordered that Lin's wife be sterilized. Lin claims "one of our relatives with connection[s] to the cadres" persuaded them "not to sterilize us" but to use an "IUD instead." J.A. 179. In support, Lin submitted a document entitled "Changle City Certificate of Family Planning Operation," which indicates that Lin's wife underwent an IUD insertion procedure on December 16, 1996. Lin also notes that his wife was directed to submit to regular gynecological exams as reflected by the pregnancy check-up cards he offered into evidence. This document lists these official pregnancy check-up visits from January 1997 to September 2001, each of which is initialed by the "Cadre-in-charge"

and a doctor. Notations for the final visit indicate that the IUD was still in place and Lin's wife was not pregnant at the time.

According to Lin's affidavit, he and his wife hired a private doctor in December 2001 to remove the IUD, and, in April 2002, Lin's wife again became pregnant. Lin's affidavit asserted that his wife hid from family-planning officials at her parents' house in LuBei village, which is part of Changle City. Lin claims this move was unsuccessful, however, as officials appeared at his mother-in-law's house on August 21, 2002, and "forcibly took [Lin's] wife to Changle City Hospital where she was involuntarily aborted on that day." J.A. 179. Lin testified that at the time the political cadre took Lin's wife for an abortion, he was away in Fuzhou City where he worked in construction. Lin learned about the abortion when his mother-in-law called him that morning; Lin says he did not see his wife until 10:00 p.m.

After the abortion was performed, family-planning officials indicated that Lin's wife would be required to undergo sterilization. Lin claims that this threat caused them to flee Changle City the day after the abortion to hide in the home of Lin's uncle in Fuzhou City — which is also in the Fujian Province — leaving their children in the care of Lin's parents in Changle City. At the hearing, Lin testified that his parents brought the children to visit his wife, but Lin did not indicate whether they came to visit more than once. To corroborate his testimony, Lin produced, in addition to the evidence already mentioned, a declaration from his wife which was signed but not notarized. The declaration was consistent with Lin's testimony in all major respects.

In December 2002, approximately four months after Lin and his wife relocated to Fuzhou City, Lin fled China, leaving his wife at his uncle's house in the hope that, "if the cadres found [her], they might not sterilize her since I [am] no longer in China." J.A. 180. Lin testified that he fears returning to China because he believes that he will be forcibly sterilized.

During cross-examination, Lin acknowledged that he left China with the help of a so-called "snakehead" who procured for Lin a Chinese passport bearing Lin's picture but a false name.[1] Lin indicated

---

[1] "Snakeheads" are professional smugglers of Chinese migrants. *See generally Silva-Rengifo v. Att'y Gen. of the United States*, 473 F.3d 58, 65 (3d Cir. 2007).

that he used his own identification card to board a plane from Changle City to Hong Kong. In Hong Kong, however, Lin was forced to use the false passport to board an international flight to Mexico and then to the United States, for which the snakehead had procured visas. (J.A. 109) Lin testified that he agreed to pay the snakehead $10,000, which he borrowed from relatives and friends. He admitted working illegally in the United States in order to repay this debt.

### B.

In an oral decision, the immigration judge (IJ) concluded that "[b]ased on the totality of the evidence," Lin-Jian failed to establish past persecution or a well-founded fear of future persecution and, therefore, was ineligible for asylum. J.A. 47. In explaining her conclusion, the IJ felt certain aspects of Lin's testimony were implausible, undercutting Lin's assertion that he feared persecution. For example, the IJ questioned whether someone who feared being discovered by the authorities to the point that he went into hiding with his wife, as Lin claimed, would continue to report for work at a construction site. The IJ also dismissed Lin's testimony that he was forced to work in order to support his family, reasoning that if Lin "was able to borrow $10,000 U.S. dollars from relatives to pay a snakehead" then "he could have borrowed money from relatives while he remained in hiding." J.A. 48. Additionally, the IJ found it unlikely that a couple in hiding from family planning cadre would permit their children to be brought to the hiding place on a regular basis to visit.

The IJ concluded that Lin's testimony regarding the circumstances of his departure from China likewise undermined Lin's claim of a well-founded fear of persecution. The IJ noted that, had Lin truly been fearful of sterilization, he would not have presented his own identification card when boarding the plane in Changle City but "would have made arrangements with the snakehead for an alternate way of leaving the country." J.A. 49.

The IJ suggested that the documents submitted by Lin to prove the existence of his two children were lacking. Citing *Matter of Ma*, 20 I & N Dec. 394 (BIA 1991), the IJ noted that when notarial birth certificates are "issued a period of time after the subject's birth . . . any and all supporting evidence should accompany such certificates as

evidence of the claimed relationship." J.A. 48. The IJ considered the Permanent Resident Registration Cards which set forth the children's dates of birth and relationship with Lin but found them "not of great assistance" because Lin's registration listed his occupation in 2001 as that of farmer, not construction worker as Lin had testified. J.A. 61.

Finally, the IJ observed that none of the government documents submitted by Lin had been authenticated and that the letter purportedly from Lin's wife had not been notarized. It is unclear whether the IJ refused on this basis to consider these documents at all or whether the IJ merely accorded the documents little weight.

Thus, the IJ denied Lin's application for asylum and, in view of Lin's failure to establish eligibility for asylum, denied Lin's application for withholding of removal under its more demanding "clear probability" standard. The IJ denied relief under the CAT as well, finding that Lin failed to meet his burden of proof for the same reasons that he failed to establish eligibility for asylum and withholding of removal. On appeal, the BIA summarily affirmed. Thus, the IJ's decision serves as the final agency determination and we review it as if it were the BIA's decision. *See* 8 C.F.R. § 1003.1(e)(4).

II.

A.

In order to be eligible for asylum, Lin must establish "refugee" status under the INA. The Attorney General has the discretion to grant asylum to an alien who successfully demonstrates that he qualifies as a refugee. *See* 8 U.S.C. § 1158(b). A "refugee" is an individual "who is unable or unwilling to return to" his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

An alien "may qualify as a refugee either because he or she has suffered past persecution *or* because he or she has a well-founded fear of future persecution." 8 C.F.R. § 1208.13(b) (emphasis added). An asylum applicant who establishes past persecution on account of a

protected ground is entitled to a presumption that he or she has a well-founded fear of persecution on that same ground. *See* 8 C.F.R. § 1208.13(b)(1); *see also Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004) ("If the applicant establishes that she has suffered past persecution, a presumption arises that she has the requisite level of fear of persecution."). The government may rebut this presumption if it establishes, by a preponderance of the evidence, that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution" in his native country or that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country" and it was reasonable to do so. 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B); *see* 8 C.F.R. § 1208.13(b)(ii). If the applicant is unable to establish a claim based on past persecution, he or she must demonstrate a well-founded fear of persecution which has both subjective and objective components, meaning "that the applicant is *subjectively* afraid and that the fear is *objectively* well-founded." *Camara*, 378 F.3d at 367. A claim based on past persecution, however, does not require the applicant to show he or she subjectively fears persecution in the country of origin. *See id.* at 369-70 ("In cases where the applicant can prove actual past persecution . . . she need not prove the subjective component of well-founded fear." (internal quotation marks omitted)).

Congress specifically included within the definition of "refugee" persons "forced to undergo an involuntary sterilization or abortion," persons "persecuted for refusing to undergo such a procedure or for other resistance to a coercive population control program," and persons with "a well-founded fear of being subjected to [a forced abortion or sterilization, or persecuted for resistance to] a coercive population control program." *Chen v. INS*, 195 F.3d 198, 202 (4th Cir. 1999); *see* 8 U.S.C. § 1101(a)(42). *See also Li v. Gonzales*, 405 F.3d 171, 176 (4th Cir. 2005) (explaining that Congress amended the definition of "refugee" in order to change previous court and BIA rulings holding "that victims of China's 'one child' policy had not been persecuted on a protected basis, and had been denied asylum requests based on this ground").

The BIA interprets this provision to cover the spouse of a person subjected to a forced abortion or sterilization, *see In re C-Y-Z*, 21 I. & N. Dec. 915, 918 (1997), and the government does not challenge

this interpretation. Courts, by and large, have approved this construction as well. *See Qiu v. Ashcroft*, 329 F.3d 140, 151 (2d Cir. 2003); *He v. Ashcroft*, 328 F.3d 593, 603-04 (9th Cir. 2003); *Cao v. Gonzales*, 442 F.3d 657, 660 (8th Cir. 2006). Thus, Lin may establish eligibility for asylum or withholding of removal by demonstrating that his wife was forced to undergo an abortion or that he himself has a well-founded fear of sterilization or other persecution if he returns to China.

### B.

Lin contends that in rejecting the application for asylum and withholding of removal, the IJ relied on an adverse credibility determination that is not supported by substantial evidence. Moreover, Lin asserts that the IJ did not discredit his testimony regarding his wife's forced abortion and failed to consider other evidence of *past persecution*.

### 1.

Lin bears the burden of proving his refugee status. *See* 8 C.F.R. § 208.13(a). "The testimony of the [asylum] applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). We must affirm the agency's decision as long as it is not "manifestly contrary to the law." 8 U.S.C. § 1252(b)(4); *see Tewabe v. Gonzales*, 446 F.3d 533, 538 (4th Cir. 2006). We defer to the agency's "credibility findings that are supported by substantial evidence." *Camara*, 378 F.3d at 367. If the IJ rejects the testimony of an asylum applicant on credibility grounds, however, he "should offer a specific, cogent reason for his disbelief." *Id.* (internal quotation marks omitted). "'Inconsistent statements, contradictory evidence, and inherently improbable testimony'" are examples of cogent reasons that could support an adverse credibility finding. *Tewabe*, 446 F.3d at 538 (quoting *In re S-M-J-*, 21 I. & N. Dec. 722, 729 (BIA 1997) (en banc). By contrast, we will not defer to an adverse credibility finding that is "based on speculation, conjecture, or an otherwise unsupported personal opinion." *Id.* (internal quotation marks omitted).

In her oral decision, the IJ concluded that Lin's testimony was not credible to the extent he claimed that, following his wife's abortion,

the couple went into hiding to avoid being forcibly sterilized by government family planning officials. Specifically, the IJ found Lin's testimony that he departed from Changle City by presenting his own identification card to government officials inconsistent with someone who was in hiding for fear of being discovered by family planning officials: "[I]f the respondent were so fearful, it seems logical to this Court that he would have made arrangements with the snakehead for an alternate way of leaving the country." J.A. 49.

Lin argues that this finding rests upon speculation, as there was no evidence that airport officials have access to the identities of, or are tasked with identifying or apprehending, Chinese nationals whom family planning officials intend to sterilize. We agree with Lin that this particular basis for rejecting Lin's testimony rests upon an unsupported implicit assumption that airport officials are equipped to identify citizens sought by family planning cadre. *Cf. Cao He Lin v. United States Dep't of Justice*, 428 F.3d 391, 405 (2d Cir. 2005) (explaining that adverse credibility finding as to applicant's forced abortion claim was too speculative where it was based on applicant's failure to produce a written abortion notice but there was no evidence suggesting that forced abortions were usually triggered by written notice).

The IJ, however, also found that Lin's testimony lacked credibility because it was inconsistent with his affidavit filed in support of his asylum application. The affidavit indicated that after his wife's forced abortion, "the cadres ordered one of us to undergo sterilization. We did not want to be sterilized . . . We went to hide in my uncle's house in Fuzhou City." J.A. 180. During the hearing, Lin confirmed that his wife went into hiding the very next day after her abortion; Lin also indicated that he was hiding at his uncle's house as well. However, Lin stated that he continued to report to work. The IJ found that this inconsistency undermined Lin's claim of well-founded fear: "If [Lin] were in fear of being sterilized, as he so claims, then he would not go in and out of hiding." J.A. 60.

Lin argues that the IJ misconstrued this testimony. Lin testified that "sometimes, I was hiding in my uncle's house. Sometimes I went to work in the construction . . . workplace." J.A. 116. The IJ concluded that if Lin truly feared that the government would find him and forci-

bly sterilize him, he would not risk going "in and out" of hiding. Lin argues that he did not believe that he was "coming out" of hiding by reporting to work and that the IJ missed the clear meaning of this testimony — that Lin continued to work *while* he was hiding at his uncle's house. Lin points out that this was consistent with his behavior prior to his wife's abortion, *i.e.*, Lin went to work in Fazhou City while his wife was hiding at her parents' home in Changle City. Although Lin's preferred interpretation of the testimony is viable, it is not the only plausible option and we are not compelled to conclude that the IJ misconstrued Lin's testimony with respect to his fear of *future persecution. See* 8 U.S.C. § 1252(b)(4)(B); *cf. Xiao Ji Chen v. United States Dep't of Justice*, 471 F.3d 315, 336 n.16 (2d. Cir. 2006) (affirming IJ's rejection of petitioner's claim that she continued to work after going into hiding from Chinese officials because "'[t]he purpose of going into . . . hiding is to avoid the officials,' and yet petitioner's workplace was 'the very first place' those officials would have searched for petitioner 'other than her home'"); *Chen v. United States Atty. Gen.*, 463 F.3d 1228, 1232 (11th Cir. 2006) (finding that IJ provided specific and cogent reason for rejecting applicant's claim that he feared arrest because applicant approached strangers and "told them where he was hiding").

Lin also argues that the court relied on speculation when it rejected his explanation for continuing to work. Lin explained that he had to support his family, requiring him to leave his uncle's house and report to his construction job in Fuzhou City. The IJ observed, however, that Lin was "able to borrow $10,000 U.S. dollars from relatives to pay a snakehead to come to the United States. If the facts are as he so claims, [Lin] could have borrowed money from relatives while he remained in hiding . . . protecting himself and his wife." J.A. 60. Lin suggests that even though he obtained $10,000 from relatives to pay the snakehead, it does not follow that he could have borrowed the money to support his family so that he would not have to report to work and risk being seen. Lin claims people would not be as inclined to lend money so that he could support his family without having to risk going to work. There is no testimony or other evidence, however, to support Lin's explanation. Lin testified simply that he paid the snakehead $10,000 and that he obtained the funds from relatives. We conclude that the IJ provided a specific and cogent reason based on common sense for dismissing Lin's explanation. Lin was, in fact, able

to obtain $10,000 which he used to pay a smuggler rather than meet his living expenses. The IJ reasonably concluded that in view of Lin's ability to acquire substantial funds, he could have borrowed enough to meet living expenses during the three month period he claimed to be in hiding. "[T]he requirement that an IJ provide a specific and cogent reason for an adverse credibility finding leaves ample room for the IJ to exercise common sense in rejecting [an applicant's] testimony even if the IJ cannot point to . . . contrary evidence in the record to refute it." *Tewabe*, 446 F.3d at 540 (internal quotation marks omitted).

Additionally, the IJ concluded that it was "implausible that [Lin's] wife is in hiding in his uncle's home in Fuzhou City, yet it appears that his parents regularly bring their children to visit her while she is in hiding." J.A. 61. The IJ noted that "if they are so fearful of the government officials discovering her hiding place, then the parents would not be bringing the children to visit her at the place of hiding." *Id.* The IJ found this testimony particularly incredible in view of Lin's testimony that government officials had previously located his wife while she was in hiding.

Lin contends that the IJ mischaracterized his testimony that his wife's parents "have brought those two children to see my wife, to visit my wife." J.A. 101-02. The IJ concluded that it was "implausible" to think that his wife's parents would "*regularly* bring their children to visit." J.A. 61 (emphasis added). Lin asserts that there is no basis to conclude that these visits occurred on a regular basis or were ongoing. We agree. It is clear that the grandparents brought the children to visit their mother in Fazhou City, but Lin did not say how often or how many times this occurred. Because the government has pointed to nothing else in the record to support this finding, we conclude it is not supported by substantial evidence. It is not clear whether the IJ would have relied on a single visit by the children, rather than ongoing visits, as a reason for rejecting Lin's claim that the couple feared being discovered by the family planning officials.

In any case, we conclude that substantial evidence supports at least two of the IJ's reasons for rejecting Lin's testimony that he has a well-founded fear of sterilization, and consequently we are not "compelled to conclude" that Lin's testimony was reliable. *See* 8 U.S.C.

§ 1252(b)(4)(B); *see also Tarrawally v. Ashcroft*, 338 F.3d 180, 187 (3d Cir. 2003) (affirming adverse credibility finding as supported by substantial evidence even though "[s]ome of the IJ's reasons for his adverse credibility determination were based on presumptions not grounded in the record").

2.

Lin contends that even if the IJ's adverse credibility findings are supported by substantial evidence, we cannot sustain the denial of asylum and withholding of removal because the IJ failed to articulate any basis for rejecting Lin's claim that he suffered *past* persecution by virtue of his wife's forced abortion. Rather, Lin suggests that none of the reasons underlying the adverse credibility determination pertain to Lin's testimony regarding his wife's forced abortion. Moreover, Lin contends that the IJ did not have a sufficient basis for discounting other independent evidence of past persecution.

We agree with Lin that the IJ did not make an adverse credibility determination with respect to his testimony regarding his wife's forced abortion. To the extent that the IJ expressed skepticism and doubt about Lin's testimony, it was that Lin's story did not demonstrate a subjective fear of persecution. A determination that Lin's testimony that he *feared* sterilization or other punishment was not believable does not defeat an asylum claim where there is also evidence of past persecution. *See Camara*, 378 F.3d at 369-70 ("In cases where the applicant can prove actual past persecution, however, a presumption arises that she has the requisite level of fear of persecution, and thus she need not prove the subjective component of 'well-founded fear.'").

When an IJ is *silent* on the issue of credibility, it is appropriate to presume that the applicant testified credibly. *See Krotova v. Gonzales*, 416 F.3d 1080, 1084 (9th Cir. 2005) ("When the BIA's decision is silent on the issue of credibility . . ., we may presume that the BIA found the petitioner to be credible."); *see also Toure v. Att'y Gen. of the United States*, 443 F.3d 310, 326 n.9 (3d Cir. 2006).[2] Here,

[2]The INA was amended through the REAL ID Act of 2005, Pub. L. No. 109-13, § 101(a)(3)(B)(iii), 119 Stat. 302, 303 (2005), to provide

because none of the IJ's credibility findings pertained to Lin's testimony about *past persecution*, the IJ was essentially silent. Thus, we can presume Lin's testimony was credible in this regard.

Lin's testimony, standing alone, "may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). However, even for credible testimony, corroboration may be required when it is reasonable to expect such proof and there is no reasonable explanation for its absence. *See In re S-M-J-*, 21 I. & N. Dec. 722, Interim Decision 3303 (BIA 1997). The requirement that the applicant provide a reasonable explanation for the lack of corroborating evidence "presumes that the IJ offers a petitioner an opportunity to explain the absence." *Obale v. Att'y Gen. of the United States*, 453 F.3d 151, 163 (3d Cir. 2006). The oral decision issued by the IJ stated in conclusory fashion that Lin failed to meet his burden of proof, but it provided no explanation as to what corroborating evidence Lin lacked, why it was reasonable to expect such corroboration, or, for that matter, whether corroboration was required at all for Lin's past persecution claim.

With respect to the IJ's conclusion that the Household Registration Card for Lin was of little value because it listed Lin's occupation as farmer rather than construction worker, Lin was afforded a chance to explain. Lin, who lived in a rural part of the Fujian Province, testified that he had been a farmer before he worked his construction job. He also suggested that the local village officials altered the Household Registration Book. Apparently, the IJ rejected this explanation; however, the IJ did not explain why a discrepancy on Lin's individual Household Registration Card rendered the Household Registration Cards of the children wholly unreliable.

Moreover, there was other evidence of the children that the IJ did not address. Lin offered the pregnancy check-up cards which included the children's dates of birth, a receipt reflecting that Lin paid a fine for violating the "birth interval," and a family photo of Lin, his wife

that, in the absence of an explicit adverse credibility finding, "the applicant or witness shall have a rebuttable presumption of credibility on appeal." 8 U.S.C. § 1158(b)(1)(B)(iii). This amended provision does not apply in Lin's case, however.

and the children. Although the IJ noted in passing that the government documents offered by Lin were not authenticated, we are not able to determine what effect, if any, the lack of authentication had on the IJ's decision. It is also unclear whether the IJ's conclusion was premised solely upon Lin's failure to comply with 8 C.F.R. § 287.6(b) or some other basis. Consular certification pursuant to 8 C.F.R. § 287.6, however, is not the exclusive means by which to authenticate such a document. *See e.g.*, *Yongo v. INS*, 355 F.3d 27, 31 (1st Cir. 2004). The record contains a letter from Lin's counsel indicating that "[b]ased on our previous attempt at authentication, it is impossible to have [Fujian] Chinese documents authenticated," and explaining that 'The Foreign Affairs Office of Fujian Province DOES NOT accept materials directly from lawyers for authentication. . . ." J.A. 319. Furthermore, Lin points out that the government did not object to the documents when they were submitted into evidence. In our view, Lin ought to have been given an opportunity to authenticate these documents through another method if, in fact, the IJ excluded them under 8 C.F.R. § 287.6 in the first place. *See Gui Cun Liu v. Ashcroft*, 372 F.3d 529, 533 (3d Cir. 2004) ("Lius should have been allowed to attempt to prove the authenticity of the abortion certificates through other means, especially where . . . attempts to abide by the requirements of § 287.6 failed due to lack of cooperation from government officials in the country of alleged persecution.").

We conclude that the denial of Lin's claim of past persecution is not supported by substantial evidence, and we remand for the IJ to consider whether the testimony and other evidence establishes that Lin suffered past persecution.

### III.

Finally, Lin challenges the denial of relief under the CAT on the basis that the IJ failed to separate analytically his CAT claim from his asylum and withholding claims. To be eligible for relief under the CAT, an applicant must demonstrate "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). He relies on *Camara* in which we concluded that, because the standard for relief under the CAT is distinct, an adverse credibility determination that defeats an asylum claim cannot alone preclude relief under the CAT. *See Camara*, 378

F.3d at 372. The rule in *Camara*, of course, "assumes that the applicant has presented other evidence to support her claim." 378 F.3d at 372. Lin did not submit any evidence suggesting it is more likely than not that a Chinese national in his circumstances would be tortured upon returning to China. Accordingly, we conclude that the denial of relief under the CAT is supported by substantial evidence.

### IV.

For the foregoing reasons, we grant the petition for review with respect to Lin's claim for asylum and withholding of removal based on past persecution, and we remand for further proceedings consistent with this opinion. We deny the petition with respect to Lin's claim that he established a well-founded fear of persecution. We also deny Lin's petition for review of the denial of his claim for relief under the CAT.

*PETITION GRANTED IN PART AND*
*DENIED IN PART*

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

With respect to Lin's request for asylum and withholding of removal, I would affirm the Board of Immigration Appeals and the Immigration Judge. Because the Board's decision was grounded on findings of fact and credibility determinations, we owe it substantial deference, particularly in this area in which the Attorney General is given broad discretion. The INA provides that the Board's findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). Moreover, we defer to credibility findings if they are supported by substantial evidence. *See Tewabe v. Gonzales*, 446 F.3d 533, 538 (4th Cir. 2006).

I cannot find on this record that the evidence "compels" findings different from those made by the Immigration Judge. *See Elias-Zacarias*, 502 U.S. at 481 n.1 ("To reverse the BIA finding, we must find that the evidence not only *supports* that conclusion, but *compels* it"). Under this deferential standard, we must affirm.

With respect to Lin's request for relief under the Convention Against Torture, I concur in the majority's opinion.

SHEDD, Circuit Judge, concurring in part and dissenting in part:

I concur in parts I, II.A, and II.B.2 of Judge Traxler's opinion, remanding Lin-Jian's asylum and withholding of removal claims for further credibility determinations with respect to past persecution. However, I believe that Lin-Jian is also entitled to a new hearing with respect to his claims of future persecution. Thus, I dissent from parts II.B.1 and III of the opinion.[1] Accordingly, I would remand for a more thorough examination of Lin-Jian's claims of both past persecution and future persecution as they relate to his requests for asylum, withholding of removal, and the Convention Against Torture.

In my view, the IJ's determination that Lin-Jian "[went] in and out of hiding" while residing at his uncle's house fails to address Lin-Jian's explanation for his actions. JA 48. Lin-Jian's testimony reveals that he considered himself in hiding throughout the entire period he and his wife resided with his uncle, even though he continued to report to work. In addressing Lin-Jian's behavior during this period, the IJ stated, "This makes no sense to this Court. If [Lin-Jian] were in fear of being sterilized, as he so claims, then he would not go in and out of hiding." JA 48. Without more explanation, the conclusory assertion that testimony "makes no sense" is not a specific, cogent reason for discrediting it, as required by *Figeroa v. INS*, 886 F.2d 76, 78 (4th Cir. 1989). Further, hiding does not necessarily require that a person never leave his home. The only evidence in the record indicates that government officials did not have accurate information regarding Lin-Jian's true place of employment.[2] The IJ offered no

---

[1]Section II.B.1 of Judge Traxler's opinion asserts that two out of four credibility determinations made by the IJ with respect to future persecution are supported by substantial evidence. I believe that none of the four credibility determinations made by the IJ with respect to future persecution are supported by substantial evidence. I address herein only the two credibility determinations upon which Judge Traxler and I differ in opinion.

[2]Lin-Jian's official household registry card stated that he worked as a farmer in Chun Lau City, but he testified that he actually worked in con-

clear rationale for rejecting this evidence, merely characterizing it as "not of great assistance in this case." JA 49. Therefore, in my view, the IJ provided no reason, much less a specific and cogent one, for the conclusion that Lin-Jian's continued employment as a construction worker constituted "go[ing] in and out of hiding." JA 48.

Further, the IJ found it inconsistent that Lin-Jian claimed to continue to work to support his family yet was able to borrow $10,000 to come to the United States. The uncontested testimony reveals that Lin-Jian was a debtor who borrowed money to flee to a country that offered vast economic opportunities. Lin-Jian testified that he was "trying to earn some money so [he could] have enough money to pay back [sic]." JA 110. As Judge Traxler correctly notes, our case law allows immigration judges to exercise common sense in evaluating the credibility of an asylum applicant. *Tewabe v. Gonzales*, 446 F.3d 533, 540 (4th Cir. 2006). However, a common sense determination — like any other credibility determination — must be based on more than mere speculation. *Id.* at 538. In my view, it is totally speculative to assert that Lin-Jian could have obtained $10,000 to avoid reporting to work and earning a wage. Indeed, common sense dictates that a person may be able to *borrow* $10,000 from individuals who expect to be repaid, even when those same individuals would not *give* $10,000 to anyone. Accordingly, I believe that this determination made by the IJ is not supported by substantial evidence and, therefore, is due no deference.

Thus, in light of "the ordinary 'remand' rule" announced in *INS v. Ventura*, 537 U.S. 12, 18 (2002), I would grant Lin-Jian's petition for review in its entirety and remand for clarification on Lin-Jian's credibility regarding both his past persecution and his well-founded fear of future persecution.

---

struction in Fuzhou City. Though the IJ expressed doubts about the helpfulness of the household registry card, she never expressly discredited it. Thus, the only conclusion to be drawn from the record is that the government-issued card was authentic but inaccurate, which serves to corroborate Lin-Jian's claim that he was able to hide from government officials despite his continued employment.