[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14587
Non-Argument Calendar

_____

Agency No. A087-444-939

WEINA YUAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 20, 2012)

Before MARTIN, JORDAN and ANDERSON, Circuit Judges.

PER CURIAM:

Weina Yuan, a native and citizen of China, petitions for review of an order by the Board of Immigration Appeals (BIA) affirming the Immigration Judge's (IJ) denial of withholding of removal under 8 U.S.C. § 1231(b)(3).  Yuan raises two issues on appeal: 1) whether prostitution constitutes a "particularly serious crime" under 8 U.S.C. § 1231(b)(3)(B)(ii); and 2) whether the BIA's credibility determination was supported by substantial evidence.

Yuan claims that, while living in China, she was persecuted and her husband was killed, because they assisted North Korean refugees and distributed Christian materials.  Chinese police arrested Yuan's husband at the couple's home on March 24, 1999 for assisting the refugees.  The morning after, Yuan's husband was found dead in the street covered by a blanket.  Although the police denied responsibility, and a city-issued death certificate indicates that Yuan's husband died of illness, Yuan testified that when she inspected his body, she found "marks and scars" on him.  After her husband's death, police returned to Yuan's house many times, and threatened her, asking for names of other activists.

In May 2000, Yuan left for South Korea.  In December 2002, she was deported back to China.  Yuan testified that in January 2003, Chinese police arrested her for her previous role in distributing Christian materials and helping North Korean citizens, detained her for five days, and beat her, all the while

2

asking for names of other activists.  Yuan claimed that between January 2003 and May 2003, she was arrested and interrogated on a least four more occasions, sometimes suffering from additional physical abuse.

After these arrests, Yuan left China and paid a smuggler to assist her in entering the United States.  Once in the United States, Yuan worked at a restaurant, and then a massage parlor where she was arrested for prostitution.

## I.

Where the BIA issues a decision, we review only that decision, except to the extent that the BIA adopts the IJ's opinion.  Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001).  We review questions of law de novo, with deference to the BIA's reasonable interpretation of the Immigration and Nationality Act.  Assa'ad v. U.S. Att'y Gen., 332 F.3d 1321, 1326 (11th Cir. 2003).  We review findings of fact under a deferential standard, and uphold those findings if they are supported by substantial evidence on the record as a whole.  See id.

## II.

To qualify for withholding of removal, an alien must show that, if returned to her home country, her life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A).  An applicant for withholding of removal may carry this

burden by establishing either past persecution on account of a protected ground, or by demonstrating that it is more likely than not that she would be persecuted upon her return. Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006). However, an alien is not eligible for withholding of removal if the Attorney General decides that "the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B)(ii).

Although the parties vigorously dispute whether prostitution constitutes a "particularly serious crime" as a matter of law, we need not reach that question because we find a more fundamental error in the BIA's opinion. Section 1231 provides for denial of withholding when an alien has been "convicted by a final judgment of a particularly serious crime." Id. (emphasis added); see also Lapaix v. U.S. Att'y Gen., 605 F.3d 1138, 1143 (11th Cir. 2010); In re N-A-, 24 I. & N. Dec. 336, 342 (BIA 2007).

Here, the BIA found that Yuan "was convicted of prostitution in 2005, twice in 2007, and again in 2010," citing to the IJ's opinion and the Form I-213 from Yuan's detention by the Department of Homeland Security. However, the IJ's opinion only states that Yuan was arrested for prostitution on those dates. As to the Form I-213, the document does not reflect multiple convictions for

4

prostitution, as the BIA indicates in its order.  While the document refers to four arrests for prostitution, it cites only one conviction for prostitution from 2007, for which Yuan received a $500 penalty and twelve months probation.[1]  There is no other record evidence of any conviction for prostitution.  Therefore, the BIA's finding that Yuan had multiple convictions for prostitution is not supported by substantial evidence in the record.  See Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1278 (11th Cir. 2009).

As to whether a single conviction for prostitution may constitute a particularly serious crime under § 1231(b)(3), we have explained that when an offense "is not a per se particularly serious crime, the Attorney General retains discretion to determine on a case-by-case basis whether the offense constitute[s] a particularly serious crime."  Lapaix, 605 F.3d at 1143 (citing In re N-A-, 24 I. & N. at 338).[2]  In making this determination, the BIA looks to the elements of the offense, In re N-A-, 24 I. & N. at 337–38, as well as "the nature of the conviction, the circumstances and underlying facts of the conviction, [and] the type of

---

[1]  The Form I-213 uses the term "[c]onvicted" for only one arrest.  It is also true that another arrest is described as: "[s]ubject paid fine in the amount of $1,113.00, instead of contensing [sic] charges in court."  However, this arrest does not reference any conviction.  We accept the document on its face, treat this distinction as a difference, and conclude that the record only supports a finding of one conviction.

[2]  By statute, a conviction for an aggravated felony resulting in a sentence of at least five years imprisonment constitutes a "particularly serious crime."  8 U.S.C. § 1231(b)(3)(B).

5

sentence imposed." In re Frentescu, 18 I. & N. Dec. 244, 247 (BIA 1982), superseded in part on other grounds by amendment to 8 U.S.C. § 1253(h)(2), as recognized in In re C-, 20 I. & N. Dec. 529, 533–34 (BIA 1992). Although the BIA retains discretion to determine whether an offense constitutes a "particularly serious crime," we review its decision to ensure that it does not exercise its discretion in an arbitrary or capricious manner. See Abdi v. U.S. Att'y Gen., 430 F.3d 1148, 1149 (11th Cir. 2005).

Here, the BIA, without citing to any evidence, considered "the totality of the impact prostitution inflicts upon a community," and determined that Yuan's prostitution conviction constituted a particularly serious crime. The BIA reached this conclusion without examining the elements of the offense, the circumstances of the conviction, or the type of sentence imposed.[3] See Yousefi v. I.N.S., 260 F.3d 318, 329–30 (4th Cir. 2001) (remanding to BIA for failing to consider any of the Frentescu factors). To some extent, every petty crime, such as speeding, jaywalking, and loitering, has an impact on the community. As a result, the BIA's reasoning reflects no analytical framework by which it can rationally distinguish

---

[3] We find no information in the record concerning Yuan's 2007 conviction, aside from the note in her Form I-213 indicating that she received a $500 penalty and twelve months probation and her testimony that she was arrested for prostitution. The record does not indicate the statute under which Yuan was convicted in 2007, or even whether her conviction was a felony or a misdemeanor.

6

crimes that are "particularly serious" from those that are not.

For the following reasons, we need not in this case decide whether a single conviction for prostitution can constitute a particularly serious crime. The fact that the BIA failed to perform the case-by-case analysis as required by its own precedent, taken together with the fact that the BIA labored under a misconception that Yuan had "repeated convictions for prostitution," indicate a need for the BIA to reconsider its holding with respect to the particularly serious crime issue.

III.

As to the BIA's adverse credibility determination, we review credibility findings under the substantial evidence standard, whereby we will affirm a credibility determination if it is supported by "reasonable, substantial, and probative evidence on the record." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005).

Credibility determinations are based upon the totality of the circumstances, and may include factors such as the inherent plausibility of the account, consistency between statements, and other corroborating evidence. 8 U.S.C. § 1158(b)(1)(B)(iii); see also Xia v. U.S. Att'y Gen., 608 F.3d 1233, 1240 (11th Cir. 2010). The BIA must offer specific, cogent reasons for its adverse credibility finding. Forgue, 401 F.3d at 1287.

Here, the BIA affirmed the IJ's adverse credibility determination on the ground that Yuan's account was inherently implausible.  Specifically, the BIA noted three issues that in its own view rendered Yuan's account implausible.  First, "even though both [Yuan] and her husband supported the North Koreans, only her husband was initially arrested, detained and killed."  Second, after the death of Yuan's husband in March 1999, Yuan lived and worked in South Korea for two years without seeking protection from that country.  Finally, the BIA relied on a United Kingdom Border Agency Report to conclude that while individuals in China are detained for providing assistance to Korean refugees, they are not persecuted.

As to the first ground cited by the BIA—that only Yuan's husband was detained and killed—this Court has held on a number of occasions that persecution may take the form of threats or violence against colleagues or relatives of the petitioner.  See, e.g., De Santamaria v. U.S. Att'y Gen., 525 F.3d 999, 1009 (11th Cir. 2008) (holding that torturing and killing of petitioner's groundskeeper was evidence of persecution); Delgado v. U.S. Att'y Gen., 487 F.3d 855, 861–62 (11th Cir. 2007) (considering severe beating of petitioner's son as evidence of persecution); Ruiz v. Gonzales, 479 F.3d 762, 764, 766 (11th Cir. 2007) (considering rape of wife of petitioner's colleague as evidence of persecution).

8

The BIA's determination that it is inherently implausible that Chinese government officials would arrest, detain and kill Yuan's husband as a means of persecuting Yuan flies in the face of our precedent establishing that persecution may take such forms. Therefore, there is nothing inherently implausible in Yuan's testimony that Chinese government officials would arrest only her husband as a way to persecute her.

As to the second ground—Yuan's failure to seek asylum in South Korea—the BIA stated that Yuan's explanation for why she did not seek asylum in South Korea was "not persuasive." Yuan had testified that she didn't seek asylum because it was widely understood that illegal Chinese aliens were not afforded protection in South Korea. The BIA's conclusory statement that Yuan's explanation was "not persuasive" can hardly be described as a specific, cogent reason supporting an adverse credibility determination. See Forgue, 401 F.3d at 1287. Further, to the extent that the basis for the BIA's conclusion originated with the IJ's opinion on this point, we find the IJ's opinion flawed. The IJ reasoned that because the 2010 International Religious Freedom Report indicates that "50 percent of [South Korea's] population is either Protestant or Catholic," Yuan's claim that South Korea would not provide protection to Chinese aliens was not "inherently credible." In fact, the 2010 International Religious Freedom Report

9

indicates that only 29.2 percent of South Korea is Protestant or Catholic.[4]  In any event, it is not clear how the religious composition of South Korea renders Yuan's explanation for failing to seek asylum there <u>inherently</u> incredible.  While these statistics might undermine the wisdom of Yuan's failure to seek asylum in South Korea, they do not contradict Yuan's understanding that illegal Chinese immigrants could not obtain protection in South Korea.  See <u>Tewabe v. Gonzales</u>, 446 F.3d 533, 539 (4th Cir. 2006).

Finally, as to the BIA's citation to a United Kingdom Border Agency Report, the BIA found Yuan's account to be inherently implausible because the Report does not explicitly mention the persecution of persons who provide assistance to North Koreans in China.  However, the Report does indicate that the Chinese government arrests and detains individuals who provide assistance to North Korean migrants.  These facts are entirely consistent with Yuan's account.  Thus, the Report neither renders unlikely, nor rules out the possibility, that Yuan's husband was arrested, detained, and killed for assisting North Korean refugees.  See <u>Dong v. Gonzales</u>, 421 F.3d 573, 578 (7th Cir. 2010) (reversing adverse credibility determination based on country reports that did not specifically refute

---

[4]  Beyond that, the Report is based on a 2005 census, while Yuan was only in South Korea from 2000 to 2002.

10

petitioner's account).

On this record, we cannot say that the BIA offered specific, cogent reasons, supported by substantial evidence, in determining that Yuan's account is inherently implausible. See Tewabe, 446 F.3d at 539. Accordingly, the credibility determination by the BIA cannot render moot the need for the BIA to reconsider the particularly serious crime issue. We remand the case to the BIA to determine anew whether Yuan is entitled to relief. See Tang, 578 F.3d at 1281.

## IV.

For the reasons stated, we GRANT the petition for review, VACATE the BIA's order, and REMAND for further proceedings consistent with this opinion.