**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JIAN TAO LIN,

*Petitioner,*

v.

ERIC H. HOLDER, JR., Attorney
General,

*Respondent.*

No. 09-1269

On Petition for Review of an Order of
the Board of Immigration Appeals.

Argued: May 11, 2010

Decided: July 12, 2010

Before MOTZ, KING, and DUNCAN, Circuit Judges.

---

Petition for review granted; vacated and remanded by pub-
lished opinion. Judge King wrote the opinion, in which Judge
Motz and Judge Duncan joined.

---

**COUNSEL**

**ARGUED:** Joshua E. Bardavid, LAW OFFICE OF JOSHUA
BARDAVID, New York, New York, for Petitioner. Todd J.
Cochran, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Respondent. **ON BRIEF:** Tony West,
Assistant Attorney General, Civil Division, John S. Hogan,

Senior Litigation Counsel, UNITED STATES DEPART-
MENT OF JUSTICE, Washington, D.C., for Respondent.

---

**OPINION**

KING, Circuit Judge:

Jian Tao Lin petitions for review of the February 2009 final
order of the Board of Immigration Appeals (the "BIA")
affirming the denial of his application for asylum, withhold-
ing of removal, and protection under the United Nations Con-
vention Against Torture (the "BIA Decision"). Lin's primary
contention is that an adverse credibility determination, made
against him by an Immigration Judge (the "IJ") and ratified by
the BIA, was erroneously predicated on facts derived from
another applicant's unrelated case. As explained below, we
grant the petition for review, vacate the BIA Decision, and
remand.

I.

A.

Lin and his wife, Xue Yun Zheng ("Zheng"), are from
China's Fujian Province, "a place where the one-child policy
has been enforced with special vigor — a reputation that per-
sists still today. Local officials in Fujian Province have
employed unspecified measures to deal with out-of-plan preg-
nancies, and, notwithstanding a purported national policy to
the contrary, forced sterilization and abortion are prevalent in
rural areas." *Li Fang Lin v. Mukasey*, 517 F.3d 685, 688 (4th
Cir. 2008) (alteration, citation, and internal quotation marks
omitted). Based on his having run afoul of China's one-child
policy, Lin has sought asylum, withholding of removal, and
protection under the Convention Against Torture (the
"CAT").

As detailed in Lin's application and testimony before the IJ, the couple's first child (a girl) was born in December 1997, when Lin was twenty years old and Zheng was nineteen. Because the legal age for marriage in China is twenty-two for men and twenty for women, the couple was not married at the time of their daughter's birth, rendering it unauthorized. To prevent the authorities' discovery of this unauthorized birth, Lin and Zheng sent the infant to be raised by Lin's older sister. Thereafter, upon Lin reaching marital age in 1999, the couple obtained a marriage permit and, in August 2000, their second child (a boy) was born. After their son's birth, Zheng was required to wear an intrauterine device (an "IUD") and report for quarterly examinations so the authorities could ensure that the IUD was in place and she was not pregnant.

During such an examination in March 2001, it was discovered that — notwithstanding the IUD and unbeknownst to the couple — Zheng was again pregnant, prompting the authorities to subject her to a forced abortion. Lin testified that he learned of the abortion when Zheng returned home following the procedure and that he "was very angry" because, like his wife, he wanted more children. *See* J.A. 127.[1] Subsequently, in March 2002, the village officials learned of the couple's daughter and threatened Lin and Zheng with sterilization. Lin explained that the authorities planned to seize him and his wife from their home to effect this sterilization. Having been warned of the plan, however, the couple was able to flee before the authorities arrived. Following this incident, Lin's family was required to pay an "[e]xcessive births fee" of 10,000 Renminbi ("RMB") so that the daughter could be listed on the household registry. *See id.* at 199.

While Lin remained in hiding in China, his wife Zheng fled to the United States in the summer of 2002. A few months later, Zheng applied in New York for asylum, withholding of

---

[1]Citations herein to "J.A. __" refer to the Joint Appendix filed by the parties in this matter.

removal, and CAT protection based on the foregoing events. In October 2003, a New York IJ denied Zheng's application on adverse credibility grounds. In 2005, the BIA affirmed the New York IJ's decision in a per curiam, one-line order, and thereafter denied Zheng's motion to reopen the proceedings.

In the interim, Lin likewise fled to the United States, leaving the couple's two children with relatives in China. On November 5, 2003, Lin called Ren Ji Zheng ("Ren Zheng"), a relative who lived in New York City, and requested that Ren Zheng meet Lin the next day at Confucius Plaza in New York City. During the phone call, Lin explained that he was in Canada but would be in New York by the next afternoon. Following Lin and his wife Zheng's reunification in New York, she became pregnant with the couple's third child. On November 21, 2004, Zheng gave birth to another daughter, an American citizen.

## B.

### 1.

In the meantime, at an IJ hearing in New York on November 5, 2004, Lin conceded removability but sought relief through asylum, withholding of removal, and the CAT.[2] In support of his application, Lin submitted affidavits from himself and Ren Zheng; documentation of his children, identity, and marriage; evidence supporting his claims of past persecution; and an expert's affidavit detailing China's extremely coercive population control measures (the "Aird Affidavit").

---

[2]Aliens such as Lin are permitted to use a single form, entitled "Application for Asylum and for Withholding of Removal," to request three separate types of immigration relief: asylum, withholding of removal, and CAT protection. *See* 8 C.F.R. § 208.3; *see also* J.A. 178 (Lin's original application). It is unclear when Lin filed his application, but it is undisputed that, at the latest, he filed it by November 5, 2004. *See* J.A. 56 (explaining, in IJ decision, that application was completed by Lin in June 2004, and signed by asylum officer in August 2004).

For example, Lin submitted Notarial Birth Certificates for his Chinese-born children. These certificates include pictures of the children, provide the dates and places of their births, and identify Lin and Zheng as their parents. Lin also provided seal-bearing hospital birth certificates for the children. Moreover, he proffered a seal-bearing Household Registry Booklet containing household registration forms issued on September 23, 2000, for his son, and October 14, 2002, for his daughter. Additionally, Lin submitted the "Receipt of Collecting Beyond Plan Birth Fee" — the receipt for the 10,000 RMB "[e]xcessive births fee" associated with his daughter — also issued on October 14, 2002. *See* J.A. 199. Further documentation included the official marriage registration for Lin and Zheng, as well as their resident identity cards.

Notably, Lin also submitted Zheng's "Child-Bearing-Age Woman Examination Certificate" booklet from the MinHou County Family Planning Committee. *See* J.A. 193. The booklet explained that a "[c]hildbearing woman who meets the ring and pregnant checkup requirement [is] issued this certificate." *Id.* at 197. Among the "[i]mportant things for childbearing women" specified in the booklet is that "[t]hose who have beyond-planned birth must immediately use supplementary measures and state the date of abortions in the handling result column." *Id.* According to the booklet, after Zheng gave birth to her son in China in August 2000, she underwent the "[h]andling result" of having an IUD inserted in October 2000. *Id.* at 194. The booklet also detailed, inter alia, that, after discovering that Zheng was pregnant in March 2001, the "[h]andlers" "[i]nduced abortion" and, in April 2001, inserted a new IUD. *Id.* at 195. In further corroboration of these events, Lin submitted various seal-bearing operation certificates from FuZhou City hospitals detailing the March 2001 abortion and the October 2000 and April 2001 IUD insertions. Additionally, Lin submitted documentation from Zheng's American doctors substantiating the removal of her IUD and

subsequent pregnancy, including her anticipated delivery date
of November 29, 2004.[3]

2.

Following the initial IJ hearing in New York, Lin's removal
proceedings were transferred to Maryland as a consequence of
Lin and Zheng's move to that state. On November 2, 2006,
the IJ conducted Lin's merits hearing, at which Lin and Ren
Zheng, the relative who had collected him in New York, testi-
fied. In its cross-examination of Lin, the Government sought
to impeach him through his wife's testimony at her own IJ
hearing regarding post-abortion events. According to the Gov-
ernment, Lin's wife stated that upon leaving the hospital after
her forced abortion, she went to her mother's house, where
she remained for twenty days. Specifically, the Government
declared:

> Now this is what your wife testified to in her hear-
> ing. She was asked, "After you left the hospital
> where did you go?" She answered, "I went to my
> mother['s]." And she was asked, "How long did you
> stay there?" And she answered, "About 20 days."
> Then she was asked, "Where did you go after that?"
> And she answered, "And then my mother-in-law
> made a phone call to me and told me that my son had
> a fever and I went home." Now you've testified that
> you saw your wife at your house the day after she
> had her abortion. After she was released from the
> clinic, from the hospital and this was the same day.
> And you also indicated that between the time that
> she left the hospital and the time that you saw her at
> your house she didn't go anywhere else. Can you

---

[3]At his merits hearing in November 2006, Lin filed a revised application
reflecting the birth of his third child on November 21, 2004. Prior to this
revision, he had supplemented his original application with evidence of
that child's birth, including, for example, her New York birth certificate.

> explain why this is different than what your wife has stated?

J.A. 132. In response to this convoluted inquiry, Lin speculated that Zheng was "probably too nervous and she make mistake." *Id.* at 133.

In the IJ merits hearing, the Government also advanced the proposition that Lin's claims were barred, either by issue preclusion or res judicata, because his wife's claims (involving identical supporting facts) had been denied. Accordingly, as its evidence, the Government submitted the IJ and BIA decisions resolving Zheng's application, as well as a State Department report on China.[4] At the conclusion of Lin's merits hearing, the IJ ordered the Government to brief whether res judicata and issue preclusion were applicable in this situation; the IJ also authorized Lin's counsel to file a response brief to the Government's submission. Finally, the IJ scheduled another hearing for March 22, 2007, when he would render his decision.

Thereafter, the Government submitted a written statement disclaiming the applicability of res judicata (without mentioning issue preclusion), but nevertheless urging the IJ to deny Lin's application. More specifically, while emphasizing that Zheng's asylum application had been denied because she was deemed incredible, the Government contended that Lin was also incredible because of the apparent inconsistency between his and his wife's testimony regarding post-abortion events. The Government also suggested that denial of Lin's application was proper because "[t]he record does not appear to contain an affidavit from [Lin's] mother." J.A. 289. In response, Lin contended that the Government's assertions were unsupported by the record. For example, he maintained that a statement from his mother was irrelevant since there was no

---

[4]The Government has never introduced a transcript of Zheng's testimony.

indication that she had personal knowledge of his wife's circumstances. Lin also objected to the Government's reliance on Zheng's testimony, as no transcript of her IJ hearing had been placed in evidence.

At the March 2007 hearing, the IJ declined to render a decision on Lin's case, given the Government's withdrawal of its res judicata and issue preclusion contentions. Instead, the IJ scheduled a new hearing for July 16, 2007. At that hearing, the IJ orally denied Lin's application, ruling that Lin had failed to prove that his asylum application was timely and that the adverse credibility of Lin (and his wife) undercut his claims for withholding of removal and CAT protection.

In deeming Lin incredible, however, the IJ mistakenly relied on a written closing statement submitted by the Government in the unrelated case of an applicant named De Hua Liu (the "Liu statement"). *See* J.A. 282.[5] Indeed, the IJ predicated several of his "findings" on factual arguments contained in the unrelated and misfiled Liu statement. These "findings" (collectively, the "unrelated Liu evidence") include, inter alia, that

- Lin did not submit corroborative evidence demonstrating that his wife was subject to a forced IUD insertion in 1993;

- Lin did not corroborate his wife's pre-1996 alleged abortion and subsequent IUD insertion;

- Lin did not submit corroboration of his wife's medical assessment visits between the 1993 IUD insertion and the 1996 IUD removal;

---

[5]Although it is unclear how the unrelated Liu statement was erroneously introduced into Lin's case, the Government acknowledged at oral argument in this matter that it must have originated with the Government.

- Lin did not know where his wife went to have her IUD removed in 1996;

- Lin did not know the name of the friend who accompanied his wife to the 1996 IUD removal; and

- Lin did not submit medical documentation corroborating the pain suffered by his wife after an abortion.

The IJ further observed that Lin had failed to offer corroboration from his mother and spouse and determined that Lin's explanation of the apparently inconsistent testimony regarding Zheng's post-abortion whereabouts was unsatisfactory. *Id.* at 57-58.[6] Accordingly, by his oral decision of July 16, 2007, the IJ denied Lin's application for asylum, withholding of removal, and CAT protection.

3.

On July 19, 2007, Lin appealed the IJ's decision to the BIA. In so doing, he primarily asserted that "this decision revolves around facts that are not contained anywhere in this record" and that, as such, the IJ's adverse credibility determination was based on clearly erroneous findings of fact. J.A.

---

[6]In the unrelated Liu statement, the Government had argued that Liu failed to produce five categories of objective documentation (including medical corroboration of IUD procedures in 1993 and 1996 and abortions in 1993 and 1997); emphasized the presence of an unauthenticated medical document demonstrating the existence of Liu's wife's IUD *after* Liu entered America; and asserted a lack of credibility, correlated to Liu's lack of knowledge of the details surrounding his wife's IUD removal in 1996 and his failure to present medical certification of treatment his wife received after an alleged abortion. *See* J.A. 282. Conversely, the Government asserted that Lin was not credible because his testimony contradicted his wife's testimony in her merits hearing and because he failed to provide corroborative evidence, namely "an affidavit from the Respondent's mother." *Id.* at 289.

16. Lin also maintained that he qualified for relief on the basis of, inter alia, the threatened sterilization of both him and his wife, as well as China's pattern of beating and detaining repatriated citizens. Furthermore, he objected to the IJ's conclusion that the claimed discrepancy between his testimony and that of his wife, who had been adjudged incredible, rendered his testimony likewise incredible. Finally, Lin challenged the IJ's finding that his asylum application was untimely.

On February 10, 2009, the BIA Decision denied Lin's appeal. First, the BIA upheld the IJ's finding that Lin failed to demonstrate by clear and convincing evidence that he filed his asylum application within one year of arriving in the United States. The BIA then concluded that, "[c]onsidering the factors cumulatively that the [IJ] relied on in finding [Lin] not credible, we do not consider his adverse credibility finding to be clearly erroneous." J.A. 3. In support of this determination, the BIA emphasized the evident discrepancy between Lin's and his wife Zheng's testimony, the IJ's finding that Lin's testimony concerning the circumstances of the forced abortion was vague, and Lin's failure to produce Zheng as a witness.[7] The BIA also faulted Lin for failing to produce any statement from his mother and explained that the IJ relied upon the lack of medical documentation — with the exception of an unauthenticated abortion certificate — in finding Lin to be incredible.[8] Finally, the BIA Decision observed that Lin had failed to "persuade" the BIA that the IJ erred in denying him CAT protection. *Id.* at 4. Notably, however, the BIA Decision failed to address Lin's contention that the IJ had erred by relying on the unrelated Liu evidence. Indeed, the BIA Decision itself relied on the unrelated Liu evidence, such

---

[7]Contrary to the BIA's description of the IJ's findings, the IJ actually found (based on the unrelated Liu statement) that the evidence concerning a 1996 IUD removal — not an abortion — was vague. *See* J.A. 57.

[8]The BIA Decision also observed that even if Lin had established that Zheng was subject to a forced abortion, he failed to demonstrate that he was a refugee.

as the assertedly vague testimony and lack of documentation, in upholding the IJ's adverse credibility determination.

Lin has filed a timely petition for review, and we possess jurisdiction pursuant to 8 U.S.C. § 1252.

II.

Where, as here, the BIA has adopted and supplemented the IJ's decision, we review both rulings. *See Cervantes v. Holder*, 597 F.3d 229, 232 (4th Cir. 2010); *see also Kourouma v. Holder*, 588 F.3d 234, 239-40 (4th Cir. 2009) ("When the BIA and [IJ] both issue decisions in a case, we review both decisions upon appeal."). In assessing an alien's petition for review, we are obliged to uphold a final order of removal unless the BIA's determination is "'manifestly contrary to the law and an abuse of discretion.'" *Ngarurih v. Ashcroft*, 371 F.3d 182, 188 (4th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(D)). The BIA "abuses its discretion when it fails to offer a reasoned explanation for its decision, [or] distorts or disregards important aspects of the alien's claim." *Hussain v. Gonzales*, 477 F.3d 153, 155 (4th Cir. 2007) (internal quotation marks omitted). The BIA's asylum eligibility and withholding of removal decisions "are deemed conclusive if supported by reasonable, substantial and probative evidence on the record considered as a whole." *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 448 (4th Cir. 2007) (internal quotation marks omitted).

In other words, "[w]e review the BIA's administrative findings of fact under the substantial evidence rule, and we are obliged to treat them as conclusive unless the evidence before the BIA was such that any reasonable adjudicator would have been compelled to conclude to the contrary." *Haoua v. Gonzales*, 472 F.3d 227, 231 (4th Cir. 2007). As such, we "defer to credibility findings that are supported by substantial evidence." *Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004). "This deference is broad but not absolute: an IJ who

rejects a witnesses's positive testimony because in his or her judgment it lacks credibility should offer a specific, cogent reason for his or her disbelief." *Anim v. Mukasey*, 535 F.3d 243, 252 (4th Cir. 2008) (alteration and internal quotation marks omitted). Moreover, if the IJ determines that an applicant's testimony is incredible, he must nevertheless evaluate the applicant's independent evidence. *Id.*

### III.

In analyzing Lin's petition for review, we first examine the eligibility criteria for the relief he seeks. With this background in mind, we then consider Lin's contention that the BIA and the IJ (collectively, the "agency") erred in predicating Lin's adverse credibility determination on the unrelated Liu evidence. Finally, we dispose of the Government's assertion that, notwithstanding the primacy of the unrelated Liu evidence in the adverse credibility determination, the agency properly denied Lin's application.

### A.

Subject to two exceptions not relevant here, an asylum application must be filed within one year of an applicant's arrival in the United States, and the agency's determination of whether the applicant has provided clear and convincing evidence of a timely filing is unreviewable. *See* 8 U.S.C. § 1158(a)(2)(B), (a)(3). Accordingly, because Lin's asylum claim was found to be untimely, only his withholding of removal and CAT claims are before us in this proceeding. Nevertheless, a proper understanding of the criteria for asylum is essential because the agency denied Lin's other claims on the premise that, were the application timely, the asylum claim would fail on credibility grounds.

To establish eligibility for asylum, an applicant is obliged to demonstrate either past persecution or a well-founded fear of future persecution "on account of race, religion, nationality,

membership in a particular social group, or political opinion."
8 C.F.R. § 208.13(b)(1). An individual can, without corrobo-
ration, satisfy this standard simply by presenting credible tes-
timony about specific facts that would cause a similarly
situated person to likewise fear persecution. *Id.* § 208.13(a);
*see Kourouma v. Holder*, 588 F.3d 234, 240 (4th Cir. 2009).
Moreover, an applicant who establishes past persecution is
presumed to have a well-founded fear of future persecution
based on the same claim. 8 C.F.R. § 208.13(b)(1).

To qualify for withholding of removal, an applicant must
establish that, if removed, a "clear probability" exists that his
freedom or life would be threatened on account of a protected
ground. *Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir.
2010). Unlike asylum, withholding of removal is a mandatory
protection for anyone whose "life or freedom would be threat-
ened . . . because of the alien's race, religion, nationality,
membership in a particular social group, or political opinion."
8 U.S.C. § 1231(b)(3)(A). A forced abortion or sterilization
— or persecution for refusing to undergo such a procedure or
for other resistance to coercive population control programs
— is deemed by statute to constitute persecution for political
opinion. *See id.* § 1101(a)(42) (defining "refugee"); *see also
Chen v. INS*, 195 F.3d 198, 202 (4th Cir. 1999).

Whereas both asylum and withholding of removal require
an applicant's fear of persecution to be based on an enumer-
ated ground, protection under the CAT is available for those
who can prove that, whatever the motivation, it is "more
likely than not that he or she would be tortured if removed to
the proposed country of removal." *Camara v. Ashcroft*, 378
F.3d 361, 371 (4th Cir. 2004) (internal quotation marks omit-
ted). As there is no subjective component to CAT eligibility,
an asylum seeker's adverse credibility determination is not
fatal to a CAT claim if the applicant provides independent
evidence demonstrating that it is more likely than not that he
would be tortured upon return to his country. *Id.* at 371-72.

Finally, although an applicant's credible testimony can establish eligibility for relief, "corroboration may be required when it is reasonable to expect such proof and there is no reasonable explanation for its absence." *Lin-Jian v. Gonzales*, 489 F.3d 182, 191-92 (4th Cir. 2007). Nevertheless, the IJ "may not rely on speculation, conjecture, or an otherwise unsupported personal opinion to discredit an applicant's testimony or [his] corroborating evidence." *Marynenka*, 592 F.3d at 601 (internal quotation marks omitted).

With these legal principles in mind, we turn to the parties' contentions in this matter.

### B.

### 1.

Lin's primary assertion is that the adverse credibility determination made by the IJ and affirmed by the BIA was erroneously — and fatally — predicated on the unrelated Liu evidence. More specifically, Lin contends that most of the delineated deficiencies were derived, nearly verbatim, from the unrelated Liu statement, which inexplicably had become part of Lin's file. Indeed, the Government concedes that the agency erred in "rel[ying] upon an incorrect document . . . that does not pertain to Lin," namely the unrelated Liu statement, and "in faulting Lin for failing to corroborate claims that did not apply to his case." Br. of Resp't 26, 27.

We agree that the agency so erred. Predicating an adverse credibility determination on unrelated facts derived from another case is manifestly contrary to law and constitutes an abuse of discretion. *See Hussain v. Gonzales*, 477 F.3d 153, 155 (4th Cir. 2007) (explaining that BIA "abuses its discretion when it . . . distorts or disregards important aspects of the alien's claim" (internal quotation marks omitted)); *see also Nken v. Holder*, 585 F.3d 818, 822-23 (4th Cir. 2009) (concluding that BIA order erroneously failed to demonstrate

proper consideration of applicant's evidence); *Chen v. INS*, 359 F.3d 121, 127 (2d Cir. 2004) (recognizing error occurs "where the agency's determination is based on an inaccurate perception of the record"). Put simply, in making a credibility finding, the agency is obliged to understand the pertinent facts and not be confused by unrelated, prejudicial material. Anything less is simply unacceptable, for

> [t]hose who flee persecution and seek refuge under our laws have the right to know that the evidence they present of mistreatment in their home country will be fairly considered and weighed by those who decide their fate.

*Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009).[9]

2.

Notwithstanding the agency's error with respect to the unrelated Liu evidence, the Government seeks to salvage the BIA Decision, contending that we are yet entitled to deny the petition. More specifically, the Government maintains that "even if the Board misconstrued evidence," that error is "irrelevant" because Lin failed to present sufficient corroborative evidence, particularly a statement "from his mother-in-law," and because "the Board's decision focused on Lin's failure to timely file his application for asylum and Lin's credibility." Br. of Resp't 25-27.[10] In essence, the Government makes a

---

[9]In this regard, we note that the agency failed to consider Lin's claim of feared future persecution and similarly failed to evaluate the evidence he actually proffered. *See Nken*, 585 F.3d at 823 (remanding "because it is not apparent from the BIA order that it considered the crux of [petitioner's] argument"); *Camara*, 378 F.3d at 371 (remanding because "the IJ erroneously overlooked Camara's other evidence in denying her application").

[10]Before our Court, the Government seeks to recast the agency's findings, theorizing that the agency "clearly meant to state 'her mother' and

harmless error assertion. *See Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004).

Put simply, we are compelled to reject the harmlessness contention. To begin with, it cannot be said that the agency's error in considering the unrelated Liu evidence "clearly had no bearing on the procedure used or the substance of the decision reached." *Ngarurih*, 371 F.3d at 190 n.8 (explaining harmless error criteria). Moreover, the Government's harmless error assertion lacks merit because the adverse credibility determination is not "supported by reasonable, substantial and probative evidence on the record considered as a whole." *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 448 (4th Cir. 2007) (internal quotation marks omitted). First, the overwhelming basis for the agency's adverse credibility finding was the "incorrect document" — the unrelated Liu statement — "that does not pertain to Lin." Br. of Resp't 26. For example, the BIA Decision relied on a lack of medical documentation and Lin's "vague" testimony, both attributable solely to the unrelated Liu statement and not to Lin.[11] Second, the lack of cor-

---

not 'his mother' when discussing Lin's failure to produce any documentation to support his claim." Br. of Resp't 25 n.6. We, of course, are obliged to review what the agency said rather than hypothesizing over what it meant to say. *See Nken*, 585 F.3d at 822. Even were this not so, though, we would reject the Government's novel assertion. In short, the record reflects that the agency meant to say what it said, as the Government's questions and written statement before the IJ referred explicitly to Lin's mother. *See* J.A. 289 (observing that "[t]he record does not appear to contain an affidavit from the Respondent's mother"); *see also id.* at 133 (asking Lin whether "you ask[ed] your mother to submit a statement").

[11]Even had the lack of documentation and unauthenticated certificate been properly attributable to Lin, they would not sustain the adverse credibility finding because the IJ never offered Lin an opportunity to explain the lack of evidence or to authenticate the certificate. *See Lin-Jian*, 489 F.3d at 192 (explaining that "[t]he requirement that the applicant provide a reasonable explanation for the lack of corroborating evidence presumes that the IJ offers a petitioner an opportunity to explain the absence" and that "Lin ought to have been given an opportunity to authenticate these documents" (internal quotation marks omitted)).

roboration from Lin's mother is, as the Government now concedes, irrelevant. *See id.* at 25-26 n.6 ("There was no testimony in the record regarding any involvement by Lin's mother in the post-abortion events.").

Third, the lack of corroboration from Lin's wife Zheng — i.e., her failure to be a witness at Lin's IJ hearing — was inextricably intertwined with the unrelated Liu evidence, with the IJ specifically connecting the significance of her absence thereto. *See* J.A. 57-58 (linking Zheng's absence to 1996 IUD removal and 1993 abortion and IUD insertion). Without this erroneous perception of the record, it is far from clear that the agency would have found Zheng's failure to be a witness problematic. *See Lin-Jian*, 489 F.3d at 191 (explaining that "[i]t is not clear whether the IJ would have [rejected the claim]" absent a mistaken factual finding); *see also Anim v. Mukasey*, 535 F.3d 243, 261 (4th Cir. 2008) (explaining that "it is likely that the IJ would have reached a different outcome if he had given due consideration to the independent evidence that he discounted because of the [erroneous] finding of fraud"). Moreover, given that Zheng had been deemed incredible by her IJ (and thus was likely to have been disbelieved), and that she was under a final order of removal (and thus subject to deportation and arrest), we have reservations concerning the agency's observation that her absence was not reasonably explained, as well as its implicit assumption that she was an available witness. *See* 8 U.S.C. § 1252(b)(4) (providing that court can overturn determination as to availability of corroborating evidence if reasonable factfinder would be compelled to conclude it is unavailable).

Fourth, the purported "material discrepancy" between Lin's and Zheng's testimony — namely the Government's proposition that Zheng testified to going to her mother's house for twenty days following the abortion and Lin testified to seeing her at home after the abortion — is simply nonexistent. And, of course, illusory inconsistencies do not lend support to an adverse credibility finding. *See Zuh v. Mukasey*, 547 F.3d

504, 508 (4th Cir. 2008). As an initial matter, the excerpts the Government recited at Lin's hearing merely indicate that after one hospital visit, Zheng went to her mother's house for twenty days. *See* J.A. 132 (stating that Zheng answered "After you left the hospital where did you go?" with "I went to my mother['s]"). Because Lin's exhibits include documentation of five Chinese hospital procedures — two IUD insertions, two births, and one abortion — any association of her testimony with the abortion is necessarily speculative and thus an insufficient basis for an adverse credibility finding. *See Lin-Jian*, 489 F.3d at 189 (noting that although "[i]nconsistent statements, contradictory evidence, and inherently improbable testimony" constitute cogent reasons for an adverse credibility finding, "speculation, conjecture, or an otherwise unsupported personal opinion" do not (internal quotation marks omitted)).

Moreover, the record actually reveals that Lin and Zheng testified consistently about her post-abortion whereabouts. The IJ decision resolving Zheng's application — which the Government submitted as evidence in Lin's case — states that Zheng testified to returning home after the abortion and to going to her mother's at a later date, after the IUD insertion. *See* J.A. 575 (explaining that Zheng testified that she "went home after the abortion procedure" and "after the insertion of the new IUD . . . . [she] fled to her mother's"). Furthermore, both the seal-bearing medical certificates and the "Child-Bearing-Age Woman Examination Certificate" reflect that the abortion occurred in March 2001 and a new IUD was inserted a month later, in April 2001. Therefore, the purported "material discrepancy" identified by the agency does not exist and cannot justify an adverse credibility finding. *See Zuh*, 547 F.3d at 508. Consequently, the adverse credibility finding made with respect to Lin is not supported by substantial evidence. Thus, we must reject the Government's harmless error assertion and remand.[12]

---

[12]Finally, the BIA Decision's conclusory assertion that Lin also failed to demonstrate that he was a refugee does not obviate the necessity of

## IV.

Pursuant to the foregoing, we grant the petition for review, vacate the BIA Decision, and remand for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED;*
*VACATED AND REMANDED*

---

remand. First, there is no indication that the BIA considered Lin's evidence, including the materials documenting his multiple children and the Aird Affidavit, in making this determination. *See Mengistu v. Ashcroft*, 355 F.3d 1044, 1047 (7th Cir. 2004) ("[A]s we tirelessly repeat, an agency opinion that fails to build a rational bridge between the record and the agency's legal conclusion cannot survive judicial review." (citation omitted)). Second, absent the adverse credibility determination, Lin's testimony regarding his opposition to China's coercive population measures and the officials' threat of sterilization could satisfy the eligibility test by demonstrating that — rather than being complicit therein — he actually opposed the forced abortion and threatened sterilization of his wife, not to mention his own threatened sterilization. *See Matter of J-S-*, 24 I&N Dec. 520 (A.G. 2008) (overturning longstanding per se spousal eligibility rule).