**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 09-2361**

_____

KONJIT AMENU,

                Petitioner,

      v.

ERIC H. HOLDER, JR., Attorney General,

                Respondent.

_____

On Petition for Review of an Order of the Board of Immigration
Appeals.

_____

Argued:  October 28, 2010         Decided:  June 13, 2011

_____

Before KING, DAVIS, and KEENAN, Circuit Judges.

_____

Petition for review granted; vacated and remanded by unpublished
per curiam opinion.

_____

**ARGUED**:  James Anthony Feroli, IMMIGRANT AND REFUGEE APPELLATE
CENTER, LLC, Alexandria, Virginia, for Petitioner.  Matthew
Allan Spurlock, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Respondent.  **ON BRIEF**:  Tony West, Assistant Attorney
General, Francis Fraser, Senior Litigation Counsel, Kate D.
Balaban, Civil Division, Office of Immigration Litigation,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Respondent.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Konjit Amenu — an Ethiopian citizen now residing in the Washington, D.C. metropolitan area — petitions for review of the November 13, 2009 final removal order of the Board of Immigration Appeals. See In re Amenu (B.I.A. Nov. 13, 2009) (the "BIA Order"). The BIA Order affirmed the January 7, 2008 decision of an immigration judge. See In re Amenu (Immigr. Ct. Arlington, Va. Jan. 7, 2008) (the "IJ Decision").[1] By virtue thereof, Amenu's requests for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (the "CAT"), were each denied. Because the IJ and the BIA misapprehended the facts, engaged in speculation, and otherwise failed to properly consider relevant evidence, we grant the petition for review, vacate the BIA Order, and remand.

I.

Amenu legally entered the United States in April 1988, but remained in this country longer than authorized. In December 1988, Amenu filed an application for asylum, which was denied in September 1989. In January 1990, the Immigration and

---

[1] The BIA Order is found at J.A. 3-5, and the IJ Decision is found at J.A. 45-54. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

2

Naturalization Service (the "INS") directed to Amenu an order to show cause why she was not subject to deportation. Later, in 1990, Amenu's case was "administratively closed" by an IJ because her address was unavailable. In October 2006, the case was recalendared at the joint request of Amenu and the Department of Homeland Security (the "DHS"), which had absorbed the INS in 2003. In February 2007, Amenu renewed her request for relief by filing a new application, by which she sought asylum, withholding of removal, and CAT protection. On August 13, 2007, the IJ conducted an evidentiary hearing on Amenu's application for relief.

A.

The evidence presented at the IJ hearing and the materials filed in support of Amenu's application revealed the following. Amenu's father served in Ethiopia's cabinet when Haile Selassie was the Emperor of Ethiopia.[2] After the so-called Derg regime overthrew Emperor Selassie's government in 1974, the Derg authorities arrested Amenu's father and detained him for seven years. The Derg authorities also arrested and detained Amenu on

---

[2] Haile Selassie reigned as Ethiopia's Emperor from 1930 until 1974. Selassie gained international recognition by fending off an invasion of his country by Italy in 1935, and by participating prominently in the funeral of President John F. Kennedy in 1963, walking alongside French President Charles de Gaulle behind the caisson carrying the assassinated President to Arlington National Cemetery.

three separate occasions. She was first detained in 1978 in Ethiopia for fifteen days while the Derg authorities determined whether Amenu's father had concealed property belonging to Emperor Selassie. Amenu was next detained in 1984 for twenty-four hours because she had not participated in a mandatory "May Day" demonstration. Amenu's third detention by the Derg was her longest — in 1987, she was held for twenty-five days upon refusing to accept her nomination to the Executive Committee of the Women's Association, a position she believed would be used for propaganda purposes. During her 1987 confinement, Derg soldiers beat and kicked Amenu. She was eventually released, and thereafter travelled to and entered the United States as a nonimmigrant visitor. The Derg regime was overthrown in 1991 and a different regime, called the Ethiopian People's Revolutionary Democratic Front (the "EPRDF"), now controls Ethiopia's government.

Amenu's application for relief expressed fear that she would face persecution from the EPRDF government if she returns to Ethiopia. To substantiate her application, Amenu appended and filed several supporting exhibits and testified at the IJ hearing. The exhibits included State Department reports concerning political conditions in Ethiopia, a picture of Amenu participating in a demonstration against the EPRDF government, the affidavit of a woman named Ghennet Girma Woldegiorgis,

4

correspondence showing Amenu's efforts to depose Woldegiorgis, and a legal memorandum supporting Amenu's application for relief.

At the IJ hearing, Amenu testified that she has been a member, since about 1995, of the Ethiopian People's Revolutionary Party (the "EPRP"), a political organization that opposes the EPRDF government. According to the 2007 Ethiopia Asylum Country Profile (the "2007 Report"), the EPRP is among the "[m]ajor [p]olitical organizations in the Diaspora" not registered with Ethiopia's mandatory National Election Board. J.A. 203; see id. at 236. The EPRDF government does not recognize the EPRP or allow it to operate in Ethiopia. See id. at 87, 251. Amenu also testified that she has attended EPRP meetings since 1995 "[a]t least once a month" and has participated in EPRP demonstrations "two to three times a year," for a total of "about fifteen" demonstrations. Id. at 106-07, 129. Amenu appended to her application for relief two letters from the EPRP's Washington, D.C. office, dated in 2000 and 2006, which confirmed that she is an "active member" of the EPRP and expressed concern that she "will face an imminent danger to her life and safety" should she return to Ethiopia. Id. at 212-13.

5

Elaborating on Amenu's EPRP activities was the affidavit of Ghennet Girma Woldegiorgis.[3] Woldegiorgis is a close childhood friend of Amenu, and — despite being the daughter of the current Ethiopian President — is "one of the prominent figures of" the EPRP. J.A. 251. Woldegiorgis herself fled Ethiopia in the 1970s, joined the EPRP in 1975, and was granted asylum by France in 1981. In 1993, Woldegiorgis travelled to Ethiopia to attend a "Peace and Reconciliation Conference," during which the EPRDF detained her. Woldegiorgis now regularly travels to Washington, D.C., where she coordinates and attends EPRP events. On her visits to the United States, Woldegiorgis and Amenu are together "frequently" for EPRP meetings, dinners, and other public social

---

[3] Her affidavit revealed that Woldegiorgis "would have loved to testify in person" at the IJ hearing, but her "authorized stay [in the United States] would have expired" by the date on which the hearing was scheduled. J.A. 250. Because Woldegiorgis was unavailable for the hearing, Amenu sought the IJ's permission to depose Woldegiorgis before she left the country. At a preliminary meeting conducted by the IJ on April 17, 2007, the IJ advised the parties that he would accept such a deposition if both sides agreed to it. The IJ further advised that, absent such an agreement, Amenu could "submit an affidavit from [Woldegiorgis]." Id. at 64-65. By her letter of the same day, Amenu sought permission from the DHS Chief Counsel to take the deposition, with the costs to be paid by her. She also advised that Woldegiorgis would depart the United States in less than two weeks, on April 30, 2007. On April 24, 2007, the DHS Chief Counsel declined to agree to the deposition. Accordingly, pursuant to the IJ's authorization, Amenu submitted the Woldegiorgis affidavit for the IJ's consideration.

gatherings.  Id.; see id. at 87 (Amenu's testimony corroborating same).

The Woldegiorgis affidavit attested to Amenu's EPRP activities, including her attendance at meetings, her distribution of leaflets, and her participation in demonstrations.  Woldegiorgis further declared, "I know that the Ethiopian government through its embassy monitors my activity in Washington, D.C.," keeping an eye on the persons "with whom I socialize, attend meetings and so on."  J.A. 251.  According to the affidavit, because of Amenu's attendance at EPRP demonstrations and her association with Woldegiorgis, "[t]he EPRDF government is aware of [Amenu]'s EPRP activities," and Amenu "would face grave danger to her life" if she returns to Ethiopia.  Id.  Amenu echoed Woldegiorgis's concern that their visible association would attract the attention of the EPRDF and cause Amenu to be persecuted.  See id. at 87, 348.

Amenu is also a supporter of the All Amhara People's Organization (the "AAPO"), an opposition group that advocates on behalf of those Ethiopians of Amhara heritage, a loose description of the ethnic group that historically has ruled Ethiopia.  Some tensions exist between Amharas and the EPRDF, although it is unlikely that a person "would be targeted simply because of his or her Amhara ethnicity."  J.A. 186.  Amenu has donated money to and distributed pamphlets in support of the

7

AAPO. Amenu testified that the EPRDF twice arrested her older brother for his involvement with the AAPO, after which he fled to the United States, where he was granted asylum. According to Amenu, the EPRDF sought to kill her younger brother, who then fled to Kenya, where he died. Amenu testified that both of her brothers were "prominent individuals" in the AAPO in Ethiopia. J.A. 110. She also confirmed that the EPRDF authorities killed her nephew.

Another of the exhibits to Amenu's application for relief was Ethiopia's entry for the 2006 State Department Country Reports on Human Rights Practices (the "2006 Report"). The introductory portion to the 2006 Report observed that "opposition parties [in Ethiopia] engaged in a steady process of consolidation" in a series of elections in 2005, but that the EPRDF remains in power and has suppressed opposition political groups. J.A. 223. In addition, the 2006 Report recited information concerning several human rights abuses in Ethiopia, including the following:

> limitation[s] on citizens' right to change their government during the most recent elections; unlawful killings, and beating, abuse, and mistreatment of detainees and opposition supporters; [and] arbitrary arrest and detention, particularly [of] those suspected of sympathizing with or being members of the opposition.

Id. In the 2005 elections, "[o]pposition parties made an unexpectedly strong showing, increasing their parliamentary

8

representation from 12 . . . to 172" of 547 seats, with the EPRDF controlling 372 seats. Id. at 238. In those same elections, however, "[o]bservers reported killings, disappearances, voter intimidation and harassment, and unlawful detentions of opposition party supporters, <u>particularly in the Amhara</u>" and certain other regions of the country. Id. (emphasis added). Protests later in 2005 resulted in the arrest of "several dozen opposition leaders," the detention of between 30,000 and 50,000 demonstrators without charge, and "arbitrary detention and killings" by the military. Id. at 239.

B.

By the IJ Decision of January 7, 2008, Amenu's three requests for relief were denied. According to the IJ, "[i]t is not reasonable to conclude that [Amenu] would be targeted by the current government and face problems upon her return to Ethiopia today." IJ Decision 8. The IJ found that Amenu testified credibly regarding her father's involvement in the Selassie government and her detentions at the hands of the Derg regime. Notably, the IJ recited what was purported to be Amenu's testimony that, during an interrogation following her third Derg detention in Ethiopia, a military leader told Amenu "that the regime knew she was involved in the EPRDF." Id. at 3, 6. The IJ thus determined that Amenu had suffered past persecution based on her third arrest and detention. Notwithstanding such

9

past persecution, however, the IJ found that Amenu did not have a well-founded fear of future persecution, on the ground that the overthrow of the Derg regime constituted a fundamental change in circumstances.[4]

The IJ also assessed whether Amenu had shown a well-founded fear of persecution due to her AAPO associations and EPRP activities. The IJ recited that Amenu's "primary argument is that the authorities will persecute her because of her Amhara ethnicity," which is unrelated to the Derg regime's persecution of her. IJ Decision 7. The IJ then found that Amenu had not demonstrated "a reasonable likelihood that the government will target her based on her ethnicity alone," because "nothing in the record . . . indicates that the government targets individuals for persecution solely because of their Amhara ethnicity." Id. With respect to Amenu's associations with and support for the AAPO, the IJ "recognize[d] that the government has continued to attack AAPO members in Ethiopia." Id. at 8. Nevertheless, the IJ determined that Amenu had not demonstrated

---

[4] As explained more fully in Part III.A hereof, a finding of past persecution entitles an asylum applicant to a presumption that she has a well-founded fear of related future persecution. This presumption may be rebutted by a finding that a "fundamental change in circumstances" has occurred in the relevant country. If an applicant's fear of future persecution is not related to her past persecution, the presumption does not apply.

10

a well-founded fear of persecution because she "was never involved in the AAPO in Ethiopia" and "has not indicated that the Ethiopian government continues to target her brother or nephew for [their AAPO] activities." Id.

The IJ accepted Amenu's claim of membership in the EPRP, but found that she was "exaggerating the scope of her current EPRP activities." IJ Decision 5. The IJ recognized that "human rights violations continue to occur against political opponents [under] the ruling government" and that "the ruling government has previously persecuted EPRP activists." Id. at 7 (citing the 2006 Report). Nonetheless, the IJ offered multiple grounds for his determination that Amenu had failed to show a well-founded fear of persecution on account of her EPRP activities:

- Amenu "admitted that she used to attend monthly EPRP meetings, but now goes to EPRP events only 'two to three times per year.'" Id. at 5. Because she is not an EPRP "leader" and her activities are "very minimal," she is "not . . . active enough in the EPRP to draw attention by the Ethiopian authorities as a political opponent," id.;

- The "letter [from the EPRP] does not refer to any specific current activities, but simply states in a conclusory manner that she is an 'active member' of the Washington, [D.C.] branch," and no evidence shows that active membership "means anything more than paying annual membership dues," id.;

- Amenu "did not participate in the [EPRP] in Ethiopia, where the government had targeted opponents," id. at 7;

11

- The EPRP "is becoming a decreasingly significant political entity" that "no longer merits inclusion in the State Department reports," id. (citing, inter alia, the 2007 Report);

- The Woldegiorgis affidavit "fails to show that [Amenu] more than minimally participates in EPRP activities." Id. at 6. "Moreover, in the absence of other credible testimony and corroborating evidence, self-serving affidavits from individuals who are biased in support of a friend are not sufficient to establish a respondent's claims," id.; and

- According to the 2006 Report, opposition parties in Ethiopia "have engaged in a steady process of consolidation" and "have made an unexpectedly strong showing in recent elections," while "major changes" have occurred in the EPRDF government, id. at 7.

Accordingly, the IJ Decision denied Amenu's application for relief. The BIA Order, filed on November 13, 2009, adopted the IJ Decision. In supplementing the IJ Decision, the BIA explained that, "[a]lthough the [EPRDF] is not above reproach," the State Department material appended to Amenu's application "actually indicates that individuals have more access to freedom of expression, political participation, and rule of law." BIA Order 2.

Amenu thereafter filed her petition for review. By order of January 4, 2010, a panel of this Court granted Amenu's unopposed motion for a stay of the BIA Order pending our disposition of this matter. We possess jurisdiction pursuant to the provisions of 8 U.S.C. § 1252.

12

## II.

When the BIA has adopted and supplemented an IJ decision, we review both rulings for substantial evidence. Jian Tao Lin v. Holder, 611 F.3d 228, 235 (4th Cir. 2010). In applying this standard of review, factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B), and an assessment of witness credibility constitutes such a finding. See Kourouma v. Holder, 588 F.3d 234, 240 (4th Cir. 2009).

## III.

In order to properly assess Amenu's petition for review, we first trace the legal architecture of her requests for asylum, withholding of removal, and CAT relief. We then describe the IJ and BIA's obligation to consider the relevant evidence and offer cogent reasons for their decisions. Applying those principles to Amenu's petition for review, we identify several errors. Finally, we evaluate whether those errors were harmless.

### A.

In order to gain eligibility for asylum, Amenu must satisfy the relevant requirements for refugee status. As applicable here, the term "refugee" means an alien "who is unable or unwilling to return to" her native country "because of persecution or a well-founded fear of persecution on account of

13

race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An applicant bears the burden of demonstrating that she is a refugee. 8 C.F.R. § 1208.13(a). The applicant "may qualify as a refugee either because . . . she has suffered past persecution or because . . . she has a well-founded fear of future persecution." Id. § 1208.13(b). If the applicant demonstrates that she has suffered past persecution on account of a protected ground, she is "presumed to have a well-founded fear of persecution on the basis of the original claim"; if the fear of future persecution is "unrelated to the past persecution," however, the presumption does not apply. Id. § 1208.13(b)(1). If the presumption applies, it may be rebutted by an IJ finding by a preponderance of the evidence that, inter alia, "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution." Id. § 1208.13(b)(1)(i)(A).

If the presumption does not apply or is rebutted, an applicant may still possess a well-founded fear of future persecution. The applicant's fear of persecution is well-founded if (1) she subjectively fears persecution in her native country on account of a protected ground, (2) "[t]here is a reasonable possibility" of such persecution if she returns, and (3) she is unable or unwilling to return to or avail herself of

14

the protection of her country because of fear, unless (4) she could avoid persecution by relocating to another part of the country and it is reasonable to expect her to do so. 8 C.F.R. § 1208.13(b)(2)(i)(A)-(C), (ii).

As relevant here, an applicant is entitled to withholding of removal if she "establish[es] that it is more likely than not that . . . she would be persecuted on account of [a protected ground] upon removal." 8 C.F.R. § 208.16(b)(2). If the applicant "fail[s] to establish the less stringent . . . standard of proof required for asylum relief," she "is necessarily also unable to establish" the "more demanding" standard of proof required for withholding of removal. Abdel-Rahman v. Gonzales, 493 F.3d 444, 449 (4th Cir. 2007). Finally, an applicant is entitled to protection under the CAT if she establishes that she "is more likely than not to be tortured in the country of removal." 8 C.F.R. § 208.16(c)(2), (4).

B.

The Supreme Court has recognized that a proper judicial review of an agency decision "requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." SEC v. Chenery Corp., 318 U.S. 80, 94 (1943). We have applied Chenery to petitions seeking review of BIA removal orders, explaining that, where "a BIA order does not demonstrate that the agency has considered an issue, 'the proper

15

course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" Nken v. Holder, 585 F.3d 818, 822 (4th Cir. 2009) (quoting INS v. Orlando Ventura, 537 U.S. 12, 16 (2002) (per curiam)). In conducting such a review, it is "our responsibility to ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder." Baharon v. Holder, 588 F.3d 228, 233 (4th Cir. 2009). As we have explained, "[t]hose who flee persecution and seek refuge under our laws have the right to know that the evidence they present of mistreatment in their home country will be fairly considered and weighed by those who decide their fate." Id.

Accordingly, an IJ cannot "base [a] decision on only isolated snippets of [the] record while disregarding the rest." Baharon, 588 F.3d at 233. Similarly, an IJ may not "distort[] or disregard[] important aspects of the alien's claim," or rule based "on an inaccurate perception of the record." Jian Tao Lin v. Holder, 611 F.3d 228, 237 (4th Cir. 2010) (internal quotation marks omitted). Nor may an IJ "rely on speculation, conjecture, or an otherwise unsupported personal opinion to discredit an applicant's testimony or [her] corroborating evidence." Id. (quoting Marynenka v. Holder, 592 F.3d 594, 601 (4th Cir. 2010)). Instead, "an IJ who rejects a witness's positive testimony . . . should offer a specific, cogent reason for . . .

16

disbelief." Id. at 235-36 (internal quotation marks omitted). At the same time, the obligation to provide a "specific and cogent reason" does not "imply that an IJ must provide extensive reasons for each and every item of testimony that is rejected," but rather "leaves ample room for the IJ to exercise common sense in rejecting an applicant's testimony even if the IJ cannot point to contrary evidence in the record to refute it." Tewabe v. Gonzales, 446 F.3d 533, 540 (4th Cir. 2006) (internal quotation marks and alterations omitted).

## C.

Our review of the IJ Decision and the BIA Order reveals a pattern of factual misapprehensions — not only of the evidence before the IJ, but also concerning the nature of Amenu's claims — as well as several instances of speculation and conjecture.

## 1.

As to the first category of errors, we identify at least six factual misapprehensions involving evidence going to the heart of Amenu's claims. Specifically, the IJ Decision inaccurately characterizes Amenu's claims; misapprehends her testimony regarding her EPRP activities; crafts a factual finding on the basis of testimony that she never gave; omits specific corroborative factual statements in the Woldegiorgis affidavit; relies on an inaccurate portrait of the status of Amenu's family members; and erroneously asserts that the EPRP is

17

not significant enough to be listed in the State Department's reports about Ethiopia.

First, the IJ misportrays Amenu's "primary argument" as being that she would face persecution because of her "Amhara ethnicity," and then knocks down this straw by reasoning that the EPRDF does not target individuals "solely" on account of their Amhara ethnicity. See IJ Decision 7. In fact, Amenu's avowed fear of persecution stems not from her ethnicity as such, but from her EPRP activities and her activities on behalf of (and family ties to prominent members of) the AAPO. Indeed, Amenu's application for relief describes her fear, reiterated in her testimony and in the Woldegiorgis affidavit, that she will face persecution "because of her actual or imputed opposition to the EPRDF and on suspicion of membership in opposition political organizations." J.A. 348.

Second, the IJ misapprehends Amenu's testimony regarding her EPRP activities. Specifically, the IJ describes Amenu's "admi[ssion]" that "she used to attend monthly EPRP meetings, but now goes to EPRP events only 'two to three times per year.'" IJ Decision 5. Amenu made no such admission. Rather, she testified that, since 1995, she has consistently attended monthly EPRP meetings and attended an average of two to three EPRP demonstrations per year. The IJ thus conflated demonstrations with meetings, and his finding that Amenu was not

18

sufficiently active in the EPRP to justify the EPRDF's attention is therefore faulty, as it proceeds from an inaccurate perception of Amenu's avowed level of EPRP participation.

Third, the IJ fashions a finding — apparently from whole cloth — that, during an interrogation following her third arrest, a Derg military leader told Amenu that they knew of her EPRDF activities. See IJ Decision 3, 6. From this, the IJ Decision intimates that, because the Derg regime has been overthrown and the EPRDF is now in power, Amenu has nothing to fear from the current government. Amenu, however, gave no such testimony, and there is no evidence suggesting that she has ever been involved with the EPRDF government.

Fourth, the IJ omits important aspects of the Woldegiorgis affidavit from his analysis. Those omitted portions explain Woldegiorgis's prominence in the EPRP, her close friendship and frequent public outings with Amenu, and Woldegiorgis's belief that the EPRDF is aware of Amenu's participation in the EPRP because the EPRDF monitors the EPRP events that Amenu attends. It appears that the IJ summarily rejected those aspects of the Woldegiorgis affidavit on the sole ground that he deemed the affidavit to be a "self-serving" statement from someone "biased in support of a friend" for which there was no "other credible testimony and corroborative evidence." IJ Decision 6. The IJ was not entitled, however, to invoke such a ground for

19

disbelieving Woldegiorgis's factual assertions, and in doing so "disregard[ed] important aspects of [Amenu's] claim[s]." Jian Tao Lin, 611 F.3d at 237. As to corroboration, we have explained that "[t]here is no general rule that evidence offered in corroboration requires independent corroboration," and therefore such evidence cannot "be discredited on the ground that it automatically require[s] corroboration." Marynenka, 592 F.3d at 602.

Nor does the IJ's blanket allegation of bias justify his discrediting of Woldegiorgis's factual assertions. We begin by observing that the IJ's description of the affidavit as "self-serving" is misplaced, as the affidavit was on behalf of Amenu only, and there was never an assertion that Woldegiorgis received any benefit from executing it. The IJ also erred in describing Woldegiorgis merely as Amenu's "friend" — she is also a prominent figure in the EPRP who has attracted additional attention from the EPRDF government because she is the daughter of Ethiopia's President. As we have explained, a letter from a party leader on behalf of a member seeking asylum can both corroborate and provide independent support for an applicant's claims, and the IJ is not free to "completely ignore[]" such evidence. Camara v. Ashcroft, 378 F.3d 361, 369-70 (4th Cir. 2004). Moreover, the IJ failed to offer a "specific and cogent" reason to reject Woldegiorgis's factual specifications.

20

*Marynenka*, 592 F.3d at 601. The IJ is not free to summarily reject an affiant's uncontroverted and plausible factual allegations. As we explained in <u>Tewabe</u>, an immigration case where the IJ "attached the bare label 'implausible' to [the applicant]'s testimony without providing specific and cogent reasons for doing so," such an "unexplained characterization is unsustainable because [the applicant]'s testimony is not inherently implausible." 446 F.3d at 539. Indeed, in <u>Tewabe</u>, the witness was more likely to be "biased" than Woldegiorgis, as the witness there was the applicant herself.

Fifth, the IJ relies on an "inaccurate perception" of the status of Amenu's family members. <u>Jian Tao Lin</u>, 611 F.3d at 237. The IJ Decision was premised in part on Amenu's perceived failure to show "that the Ethiopian government continues to target her brother or nephew" for their AAPO activities. IJ Decision 8. This aspect of the IJ's reasoning is erroneous. It is also somewhat perplexing because the IJ Decision elsewhere recites Amenu's testimony that her nephew died at the hands of the EPRDF and that her brother fled from the EPRDF to the United States, where he was granted asylum. The IJ Decision also overlooks Amenu's testimony that another brother died in Kenya after fleeing the EPRDF. Clearly, the EPRDF is incapable of "continu[ing] to target" Amenu's family members, and thus the IJ erred in expecting Amenu to produce evidence thereof. Moreover,

21

the IJ Decision was issued without the benefit of our recent decision in Baharon, where we explained that "[v]iolence or threats to one's close relatives is an important factor" in determining whether an applicant has a well-founded fear of persecution.  588 F.3d at 232.

Sixth, the IJ erroneously asserts that the EPRP is "decreasingly significant" because it "no longer merits inclusion in the State Department reports."  IJ Decision 7 (citing, inter alia, the 2007 Report).  Strikingly, the EPRP is listed as a "[m]ajor [p]olitical organization[]" in one of the very reports that the IJ Decision perceives as not mentioning the EPRP at all.  J.A. 203 (the 2007 Report).

## 2.

The second category of errors in the IJ Decision is the speculation and conjecture that it utilizes to support the proposition that Amenu failed to demonstrate a well-founded fear of persecution.  As explained above, an IJ is not entitled to engage in speculation or conjecture, or rely on unsupported personal opinion, to discredit an applicant's evidence.  See Marynenka, 592 F.3d at 601.  Three specific aspects of the IJ Decision contravene this settled principle.

First, the IJ's conclusion that Amenu is unlikely to stand out as an EPRDF opponent because she has never held a leadership position in the EPRP — and engaged in only limited activities

22

for the EPRP — is entirely speculative, and overlooks the likelihood that Amenu would stand out as an EPRDF opponent for multiple reasons.  We need not look far to identify how Amenu's opposition activities could otherwise come to the EPRDF's attention — namely, her close friendship and frequent public outings with Woldegiorgis, an EPRP leader and daughter of the Ethiopian President whose uncontroverted affidavit specifies that (1) her own activities are monitored by the EPRDF and (2) the EPRDF is aware of Amenu's involvement with the EPRP.  Indeed, Amenu expressed her personal fear of the EPRDF government on account of those associations, both in her application for relief and in her testimony.  See J.A. 87, 348.  Moreover, the State Department reports make clear that the EPRDF's suppression of contrary views is hardly limited to those at the upper echelons of opposition groups.  Those reports reveal multiple human rights violations against individuals other than opposition leaders — including "unlawful killings, and beating, abuse, and mistreatment of detainees and opposition supporters by security forces," as well as "arbitrary arrest and detention, particularly [of] those suspected of sympathizing with or being members of the opposition."  Id. at 223 (emphasis added); see also id. at 225-26, 235, 239.

Second, it was speculative for the IJ to assert that Amenu is not likely to face persecution because she did not

23

participate in the EPRP or the AAPO in Ethiopia. See IJ Decision 7-8. Such reasoning appears to rest on the questionable premise that the EPRDF will persecute only those who have engaged in opposition activities within the geographical bounds of Ethiopia. The IJ offers no evidentiary support for this premise, and we are unwilling to accept it, especially when the IJ "recognizes that the [EPRDF] has continued to attack AAPO members in Ethiopia." Id. at 8. Put simply, "there is nothing implausible about the idea that" the EPRDF will persecute, on their return to Ethiopia, individuals who have engaged in opposition activities while abroad. Camara, 378 F.3d at 369 (rejecting IJ's adverse credibility finding because IJ's reasoning was "based only on speculation"). Indeed, the IJ's premise in this regard is contradicted because, when Woldegiorgis returned to Ethiopia for the 1993 conference, the EPRDF government detained her.

Finally, the IJ's conclusion that Amenu is not likely to face persecution because the EPRP is "a decreasingly significant political entity" is also based on speculation and conjecture. That is, the IJ's conclusion is premised on the dubious assumption that the EPRDF will persecute individuals involved in an opposition group only so long as it perceives the group as significant. Yet the IJ offers no basis for the proposition that the EPRDF — which, he concedes, continues to contravene the

24

human rights of political opponents, see IJ Decision 7 — would cease to persecute members of an opposition group (like the EPRP) that it had previously persecuted, simply on account of the group's diminishing prominence.

D.

Having identified errors in the IJ Decision (and, by extension, the BIA Order), we must, in deciding whether to vacate and remand, also assess whether those errors are harmless. See Ngarurih v. Ashcroft, 371 F.3d 182, 190 n.8 (4th Cir. 2004) (explaining that harmless error analysis applies to immigration cases). Even where the agency has failed to consider all the evidence or where some of the reasons offered for its decision are invalid, we may yet affirm if "the alleged error clearly had no bearing on the . . . substance of the decision reached." Id. (internal quotation marks omitted). By contrast, we have remanded where, "[w]ithout [its] erroneous perception of the record, it is far from clear that the [adjudicator] would have" made the inferences and conclusions that it made, Jian Tao Lin, 611 F.3d at 238; if "it is not apparent from the [agency] order that it considered the crux of [the applicant's] argument," Nken, 585 F.3d at 823; or if "it is likely that the [adjudicator] would have reached a different outcome if he had given due consideration to the independent

25

evidence that he [improperly] discounted," Anim v. Mukasey, 535 F.3d 243, 261 (4th Cir. 2008).

In these circumstances, we are unable to say that the IJ and the BIA would reach the same decision again, if they properly assess the evidence and refrain from speculation and conjecture. To begin with, the IJ's speculative assumptions taint his reasoning, and removing even one of these pillars could well result in a different outcome. We are just as skeptical that the IJ's misapprehensions of fact were harmless. To begin with, the prejudice to Amenu is self-evident, in that the IJ expressly relies on his erroneous perceptions of three crucial facts: Amenu's avowed level of EPRP activities; the "decreasing[] significan[ce]" of the EPRP; and the absence of ongoing persecution against Amenu's family members. See IJ Decision 7.

We are also convinced that the IJ's treatment of the Woldegiorgis affidavit was prejudicial. Cf. Gonahasa v. INS, 181 F.3d 538, 542 n.2 (4th Cir. 1999) (finding agency's failure to consider affidavit from applicant's spouse to be harmless, where most of affidavit related to issue upon which applicant prevailed in agency proceedings and balance of affidavit did not undermine BIA's reasoning). The IJ's failure to fully assess Woldegiorgis's uncontroverted factual statements prejudiced Amenu in at least two respects. First, such failure caused the

IJ to overlook how those corroborative facts lend credence to Amenu's claim that the EPRDF is aware of her EPRP activities because of her association with Woldegiorgis and participation in monitored demonstrations. Second, such failure resulted in the IJ overlooking the possibility that the EPRDF might become aware of and persecute Amenu, not only because of her level of EPRP activities, but also because of her visible association with a prominent opposition figure whose social and political activities the EPRDF monitors.

IV.

Pursuant to the foregoing, we grant Amenu's petition for review, vacate the BIA Order, and remand for such other and further proceedings as may be appropriate.

PETITION FOR REVIEW GRANTED;
VACATED AND REMANDED

27